VIRGINIA INDONESIA COMPANY,
Petitioner,

v.

HARRIS COUNTY APPRAISAL DIS-
TRICT and Harris County Appraisal Re-
view Board, Respondents.

No. 94–0245.

Supreme Court of Texas.

Argued Dec. 15, 1994.

Decided Oct. 27, 1995.

Rehearing Overruled Dec. 22, 1995.

J. Randolph Burton, Houston, for petitioner.

Kenneth Wall, Houston, for respondents.

CORNYN, Justice, delivered the opinion of the Court in which PHILLIPS, Chief Justice, and GONZALEZ, HIGHTOWER, ENOCH, SPECTOR, and BAKER, Justices, join.

In this case we consider whether goods purchased by the Virginia Indonesia Company (VICO) on behalf of an Indonesian joint venture are exempt from a state ad valorem tax. The trial court granted VICO's motion for summary judgment on the basis that the goods are exempt from taxation under the import-export and commerce clauses of the United States Constitution and under section 11.01 of the Texas Tax Code. U.S. CONST. art. 1, § 10 (import-export) & art. 1, § 8 (commerce). The court of appeals reversed. 871 S.W.2d 864. We reverse the judgment of the court of appeals and render judgment that the tax at issue violates the import-export clause of the United States Constitution.

VICO, a Delaware corporation, is the operator and agent for an Indonesian oil and gas exploration joint venture. As one of its duties as operator, VICO purchases goods from vendors throughout the United States on behalf of the joint venture. Pursuant to a production sharing agreement between the joint venture and Pertamina, a state enterprise of the Republic of Indonesia, the goods become the property of Pertamina upon arrival in Indonesia. VICO is reimbursed for its costs, but it receives no additional compensation.

VICO uses a standard purchase order marked "FOREIGN PURCHASE ORDER" that includes the notation "Ultimate destination for all items on this order is Indonesia."

At the time of purchase, the goods are committed to foreign export and cannot thereafter be diverted to domestic use. The goods are transported from the vendors directly to an independent export packer in Houston, Harris County, Texas. Upon arriving at the export packer's facility, the goods are checked to confirm that the proper items were shipped, and that they meet specifications required for import to Indonesia. Any dispute over the items are resolved at that time. VICO then requests approval from Indonesia to import the goods. When approval is granted, an international inspection agency inspects the goods on behalf of Indonesia and clears the goods for shipment. The goods are then packed and shipped abroad on the next available vessel.

In most instances, the goods remain with the export packer no longer than 45 days while these procedures are being performed. In exceptional cases, however, this period may be somewhat longer: if the goods received from the vendor are damaged or defective, or if VICO encounters problems obtaining approval for import to Indonesia, the goods may remain with the export packer for up to 175 days. VICO has some quantity of goods present at the export packer's facility year-round.

For the tax years 1989 and 1990, VICO was granted an exemption from ad valorem taxation for its personal property in Harris County. In September 1991, VICO was notified by the Harris County Appraisal District that its estimated ad valorem tax liability for 1991 was $8,441.74, which was based on a $380,260.00 appraisal of VICO's property at the export packer's facility on January 1, 1991. VICO timely protested the tax assessment, including the appraised value, to the Harris County Appraisal Review Board. The Review Board affirmed, and VICO filed suit in district court against the Appraisal District and the Review Board (collectively, Harris County).

In its motion for summary judgment, VICO argued that its goods are merely in transit through Texas and that they are therefore immune from state taxation under the import-export and commerce clauses of the United States Constitution. VICO further argued that its goods are not subject to the state's taxing authority because they do not meet the criteria of Texas Tax Code § 11.01(c). The trial court granted VICO's motion for summary judgment on both grounds. The court of appeals reversed, holding that VICO failed to conclusively prove the existence of either federal or state grounds for an exemption from the ad valorem tax. 871 S.W.2d at 871.

Our summary judgment standard is well established. The movant must show that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). If the movant establishes the right to judgment, the burden shifts to the nonmovant to raise a fact issue that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). In deciding whether there is a disputed material fact issue, we regard evidence favorable to the nonmovant as true. *Nixon*, 690 S.W.2d at 548–49.

## I

The import-export clause of the United States Constitution provides:

> No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws....

U.S. CONST. art. 1, § 10, cl. 2.

Historically, the United States Supreme Court decided import-export clause challenges by focusing on the nature of the goods, that is, whether the tax-burdened goods were imports or exports. Under the "original package" doctrine, goods were deemed to be imports, and hence immune from state and local taxation, as long as they retained their original form or package of import. *Low v. Austin*, 80 U.S. 29, 34, 20

L.Ed. 517 (1871) (holding that French champagne, which had been stored in its "original cases, unbroken and unsold" since its importation, was immune from a nondiscriminatory state property tax); *see also Anglo–Chilean Nitrate Sales Corp. v. Alabama,* 288 U.S. 218, 53 S.Ct. 373, 77 L.Ed. 710 (1933); *Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 65 S.Ct. 870, 89 L.Ed. 1252 (1945).

■■■■ Whereas the original package doctrine applied to imports, the "stream of export" doctrine controlled exports.[1] Under this doctrine, goods are not subject to state taxation once exportation has commenced, which occurs when goods "have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." *Coe v. Errol,* 116 U.S. 517, 527, 6 S.Ct. 475, 478, 29 L.Ed. 715 (1886). The mere intent to export is not enough, *Empresa Siderurgica v. County of Merced,* 337 U.S. 154, 157, 69 S.Ct. 995, 997, 93 L.Ed. 1276 (1949); the goods must begin their "physical entry into the stream of exportation." *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 71, 94 S.Ct. 2108, 2114, 40 L.Ed.2d 660 (1974); *see also Richfield Oil Corp. v. State Bd. of Equalization,* 329 U.S. 69, 81–83, 67 S.Ct. 156, 162–64, 91 L.Ed. 80 (1946). Once exportation has begun, goods retain their "export" status, and thus remain exempt from state taxation as long as they are in transit. Temporary interruptions "due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement" do not break the continuity of transit; however, stoppages that serve the owner's business purpose interrupt the goods' continuity of transit, rendering them subject to the taxing power of the state. *Minnesota v. Blasius,* 290 U.S. 1, 9–10, 54 S.Ct. 34, 36–37, 78 L.Ed. 131 (1933). The continued validity of the stream of export doctrine is of prime importance in this case.

In the seminal case of *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 301, 96 S.Ct. 535, 548, 46 L.Ed.2d 495 (1976), the United States Supreme Court altered its approach to import-export clause challenges and rejected the original package doctrine of *Low v. Austin.* See generally Walter Hellerstein, *Michelin Tire Corp. v. Wages: Enhanced State Power to Tax Imports,* 1976 SUP.CT. REV. 99 (explaining *Michelin* ). The issue in *Michelin* was whether Georgia could assess a nondiscriminatory ad valorem tax on imported goods held in the taxpayer's warehouse. Rejecting the argument that the tax was unconstitutional simply because it burdened goods in their original packages, the *Michelin* court concentrated on whether the tax offended any of the three policies underlying the import-export clause:

[ (1) ] the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; [ (2) ] import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and [ (3) ] harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

423 U.S. at 285–86, 96 S.Ct. at 540–41 (footnotes omitted). Addressing the first of these concerns, the Court determined that the tax levied on the taxpayer's goods did not impede the federal government's power to speak with "one voice," explaining that:

[b]y definition, such [nondiscriminatory property taxation] does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any

---

**1.** This doctrine, which analyzes whether the goods are in transit at the time of taxation, has been developed under both the import-export and commerce clauses of the U.S. Constitution.

importation in a manner inconsistent with federal regulation.

*Id.* at 286, 96 S.Ct. at 541. Nor, the Court held, did the tax offend the second policy concern, which implicates only the federal government's right to the revenue raised from taxes assessed on the commercial privilege of bringing goods into the United States. *Id.* at 286–87, 96 S.Ct. at 541 (stating that nondiscriminatory ad valorem taxation "deprives the Federal Government of nothing to which it is entitled").

Finally, the Court held that the tax did not interfere with the harmony among the states policy. The nondiscriminatory ad valorem tax at issue, explained the Court, was simply "a *quid pro quo* for benefits actually conferred by the taxing State." *Id.* at 289, 96 S.Ct. at 542. The Court reasoned that the taxpayer's imported goods, like all other property within the taxing jurisdiction, benefit from the provision of local services such as police and fire protection, and that the import-export clause was not designed to shield such goods from paying their fair share for these services. *Id.* The Court, however, qualified its holding in the following words:

> [T]he Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State. A nondiscriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by *prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed.*

*Id.* at 290, 96 S.Ct. at 543 (emphasis added) (footnotes omitted). This qualification was not implicated in *Michelin* because the Court determined that the taxpayer's goods "were no longer in transit." *Id.* at 302, 96 S.Ct. at 548. Having concluded that the Georgia tax

did not impinge on any of the three policies underlying the import-export clause, the Court upheld its constitutionality.

The next year, the United States Supreme Court applied *Michelin*'s analytic framework in *Department of Revenue v. Association of Washington Stevedoring Cos.*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1977).[2] In that case, the State of Washington assessed a business and occupation tax on stevedoring, the business of loading and unloading cargo from ships. Addressing the taxpayer's import-export clause challenge, the Court concluded that the tax violated none of the policies articulated in *Michelin*. The Court went on to consider the significance of *Michelin*'s exception for in-transit goods:

> The Court in *Michelin* qualified its holding with the observation that Georgia had applied the property tax to goods "no longer in transit." 423 U.S., at 302, 96 S.Ct. at 548. Because the goods were no longer in transit, however, the Court did not have to face the question whether a tax relating to goods in transit would be an "Impost or Duty" even if it offended none of the policies behind the Clause. Inasmuch as we now face this inquiry, we note two distinctions between this case and *Michelin*. First, the activity taxed here occurs while imports and exports are in transit. Second, however, the tax does not fall on the goods themselves. The levy reaches only the business of loading and unloading ships.... Despite the existence of the first distinction, the presence of the second leads to the conclusion that the Washington tax is not a prohibited "Impost or Duty" when it violates none of the policies.

435 U.S. at 755, 98 S.Ct. at 1402 (footnote omitted). Thus, drawing a distinction between a direct tax on *goods* and a tax on the *business of handling goods,* the Court upheld the stevedoring tax. *Id.* at 756–57, 98 S.Ct. at 1402–03 (stating that the "immunity of services incidental to importing and export-

---

2. The *Michelin* test applies with equal force to imports and exports. *Washington Stevedoring,* 435 U.S. at 758, 98 S.Ct. at 1403. However, U.S. Const. art. 1, § 9 forbids federal taxation of

exports; therefore, the second "federal revenue enhancement" policy in *Michelin* is not implicated in export tax cases. *Id.*

ing [is] not so broad as the immunity of the goods themselves"). Because the tax did not directly burden the goods, the Court expressly declined to consider the applicability of the *Michelin* approach when a state directly taxes imports or exports in transit. *Id.* at 757 n. 23, 98 S.Ct. at 1403 n. 23.

Most recently, the United States Supreme Court considered whether a Tennessee sales tax on the rental of leased cargo containers violated the policies underlying the import-export clause. *Itel Containers Int'l Corp. v. Huddleston,* 507 U.S. 60, 113 S.Ct. 1095, 122 L.Ed.2d 421 (1993). Because the containers were used in the international shipping industry, the taxpayer argued that the tax violated the import-export clause. The Court concluded that the tax did not violate any of the policies identified in *Michelin,* noting specifically that the tax was not "a tax on importation or imported goods, but a tax on a business transaction occurring within the taxing State." *Id.* at 77, 113 S.Ct. at 1106.

Just last year, we considered the impact of the import-export clause on the scope of state taxing authority in *Diamond Shamrock Refining and Marketing Co. v. Nueces County Appraisal District,* 876 S.W.2d 298 (Tex.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994). In *Diamond Shamrock,* we assessed whether oil imported from a foreign country directly into Texas, the state of its final destination, may be subject to state ad valorem taxation. *Id.* at 298. The parties stipulated that the oil was in transit through Nueces County at the time of taxation. The taxpayer argued that the tax fell within *Michelin*'s "merely in transit" qualification and was, thus, unconstitutional under the import-export clause. We disagreed, stating:

> [T]he *Michelin* Court's qualification clearly applies only to goods in transit through the state to or from another state and not to goods merely in transit within the only state the goods ever enter.

*Id.* at 301 (citing Robert C.W. Frantz, Comment, *Constitutional Law—Nondiscrimina-*

*tory Ad Valorem Tax May Be Applied to Imports,* 30 RUTGERS L.REV. 193, 197 (1976)). We then held that the third policy in *Michelin,* preserving harmony among the states, was not implicated because the imported oil was not transported *to or from* another state. *Id.* at 300–01. Rather, the imported oil reached its first and final domestic destination upon arrival in Texas. Thus, there was no risk of multiple taxation by different states. Neither did we perceive that the tax could conflict with either the "one voice" or "federal revenue enhancement" policies articulated in *Michelin. Id.* at 301 n. 3. We expressly declined to reach the issue of whether the import-export clause prohibits state taxation of goods passing through Texas on their way to a foreign country. *Id.* at 299.

## II

VICO argues that neither *Michelin* nor its progeny have altered the fundamental rule that goods in the export stream of commerce are exempt from taxation. Rather than supplanting this doctrine, VICO urges that *Michelin*'s qualification for in-transit goods, 423 U.S. at 286, 96 S.Ct. at 541, requires a threshold determination of whether the goods are merely in transit through the state at the time of taxation. If so, VICO argues, the tax is unconstitutional, and it is unnecessary to analyze whether the tax impinges upon the *Michelin* policies. While Harris County acknowledges that the stream of export doctrine has not been expressly overruled, it questions its continued viability after *Michelin. See Itel,* 507 U.S. at 77, 113 S.Ct. at 1106. Harris County urges this Court to apply the approach set forth in *Michelin,* which, it argues, demonstrates that the tax at issue undermines none of the clause's underlying policies.

The United States Supreme Court has yet to announce whether the new approach set forth in *Michelin* should be applied to a direct tax on imports or exports in transit. Although the *Michelin* court rejected the original package doctrine, it did not overrule *Coe v. Errol* or any of the stream of export

cases, and the two doctrines are different enough that the rejection of one does not, of itself, signify the demise of the other.

The sole relevant factor in the original package doctrine was whether the goods' original packaging remained intact. This led to criticism that the doctrine tended to produce superficial and disparate results. *See Michelin*, 423 U.S. at 282–83, 96 S.Ct. at 539–40. The doctrine's broad reach shielded not only goods that were in import transit, but also goods that were permanently situated within the state of their final destination. As the Court wrote in *Michelin*, "[n]othing in the history of the Import–Export Clause even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on *imported goods that are no longer in import transit* was the type of exaction that was regarded as objectionable by the Framers of the Constitution." 423 U.S. at 286, 96 S.Ct. at 541 (emphasis added).

In contrast, the definition of "exports" under the stream of export doctrine has been much narrower, encompassing only those goods that have commenced "an actual movement into the stream of export." *Kosydar v. National Cash Register Co.*, 417 U.S. 62, 71, 94 S.Ct. 2108, 2113–14, 40 L.Ed.2d 660 (1974). Unlike its corollary, commentators have regarded the stream of export doctrine as "commendably intelligible and consistent," *see* Walter Hellerstein, *Michelin Tire Corp. v. Wages: Enhanced State Power to Tax Imports*, 1976 SUP.CT.REV. 99, 132, and just two years before *Michelin*, the United States Supreme Court praised it. *Kosydar*, 417 U.S. at 71, 94 S.Ct. at 2113–14 ("This is an instance, however, where we believe that simplicity has its virtues."). As one commentator has noted, "both the language and the expressed purpose of the clause as being designed to prohibit the seaboard States 'from ... taxing goods merely flowing through their ports to other States,' indicate that property taxes imposed on exports

awaiting shipment abroad ... were intended to be proscribed." 1 JEROME R. HELLERSTEIN, STATE TAXATION ¶ 5.4 (1983) (*quoting Michelin*, 423 U.S. at 285–86, 96 S.Ct. at 540–41).

Abandoning the original package doctrine "brought *import* tax immunity into alignment with *export* tax immunity" and eliminated what had previously been a wide loophole to state taxation. Robert C.W. Frantz, Comment, *Constitutional Law—Nondiscriminatory Ad Valorem Tax May Be Applied To Imports*, 30 RUTGERS L.REV. 193, 203 (1976); *see also* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6–23 (2d ed. 1988) (noting that the original package doctrine operated as a shield to state taxation). Nonetheless, the rejection of the original package doctrine does not compel the conclusion that the *Michelin* court abandoned the rule of immunity for in-transit goods. To the contrary, by explicitly articulating an exception for in-transit goods, *Michelin* appears to preserve bright-line immunity for goods in the stream of export. Whether this is indeed the case, however, remains uncertain because none of the Court's post-*Michelin* cases has involved a direct tax on in-transit goods,[3] and the Court has stated its preference to "defer decision [on this issue] until a case with pertinent facts is presented." *Washington Stevedoring*, 435 U.S. at 757 n. 23, 98 S.Ct. at 1403 n. 23.

■ Faced with the decision of whether to apply the stream of export rule or to abandon it, we choose the former. In reaching this choice, we are mindful of the words of the United States Supreme Court: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [the lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct.

---

3. The United States Supreme Court has carefully distinguished the taxes at issue in *Michelin*, *Washington Stevedoring*, and *Itel* from one that

falls directly on in-transit goods. *See Michelin*, 423 U.S. at 302, 96 S.Ct. at 548; *Washington Stevedoring*, 435 U.S. at 755–757, 98 S.Ct. at

1917, 1921–22, 104 L.Ed.2d 526 (1989); *see also Quill Corp. v. North Dakota,* 504 U.S. 298, 321, 112 S.Ct. 1904, 1916, 119 L.Ed.2d 91 (1992) (Scalia, J., concurring). In light of the fact that the United States Supreme Court has not overruled *Coe v. Errol* or any of its progeny, we apply the long-standing rule that a tax on goods in the export stream of commerce violates the import-export clause.[4] *See generally* 2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW § 13.2 (2d ed. 1992); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6–23 (2d ed. 1988); 1 JEROME R. HELLERSTEIN, STATE TAXATION ¶ 5.4 (1983).

### III

The question we now determine is whether VICO's goods were in the export stream of commerce when the tax was assessed. VICO argues that exportation began when its goods were shipped from the vendors to the export packer's facility and that the temporary stoppage of the goods in Harris County did not break the continuity of transit.

 In this case, it is clear that VICO's goods entered the export stream of commerce when they were shipped from the vendors to the export packer's facility in Harris County because, at that point, the goods began their movement to a precommitted foreign destination. *See ·Kosydar,* 417 U.S. at 70, 94 S.Ct. at 2113; *Richfield Oil,* 329 U.S. at 82–83, 67 S.Ct. at 163–64 (holding that delivery of oil into a storage tank of a foreign-bound steamer "marked the commencement of the movement of the oil abroad"); *A.G. Spalding & Bros. v. Edwards,* 262 U.S. 66, 68, 43 S.Ct. 485, 485–86, 67 L.Ed. 865 (1923) (holding that delivery of goods to an export carrier for shipment abroad constituted a significant "step in exportation"). The more difficult question before us is whether the temporary stoppage of the goods at the export packer's facility dis-

rupted the goods' continuity of transit, thus subjecting them to taxation in Harris County on January 1. It is the *purpose* of the stoppage that is important. *See Champlain Realty Co. v. Town of Brattleboro,* 260 U.S. 366, 376–77, 43 S.Ct. 146, 148–49, 67 L.Ed. 309 (1922). If the stoppage is attributable to the business purpose of the owner, then the exportation is deemed to have terminated, and the goods are subject to tax in the jurisdiction of their stoppage. *Minnesota v. Blasius,* 290 U.S. 1, 11–12, 54 S.Ct. 34, 37–38, 78 L.Ed. 131 (1933). For instance, if goods are delayed for the purpose of further processing or for storage pending the receipt of orders, the goods are no longer in the stream of commerce. *See Bacon v. Illinois,* 227 U.S. 504, 33 S.Ct. 299, 57 L.Ed. 615 (1913) (holding that stoppage of grain for processing served owner's business purpose); *Blasius,* 290 U.S. at 12, 54 S.Ct. at 38 (holding that storage of inventory awaiting orders served owner's business purpose).

 If, however, a stoppage is "due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement," continuity of transit is not interrupted, and the goods remain immune from taxation throughout the stoppage. *Blasius,* 290 U.S. at 9–10, 54 S.Ct. at 36–37. Delays that are incidental to the journey and to a necessary change in the mode of transportation do not affect the continuity of transit. In *Hughes Bros. Timber Co. v. Minnesota,* 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359 (1926), the United States Supreme Court considered whether logs retained their in-transit status during a delay between the time they floated down the river and the time they were loaded on to a ship for further transport. In concluding that the logs retained their in-transit status throughout the stoppage, the Court stated:

> The character of the shipment in such a case depends upon all the evidential cir-

---

1401–03; *Itel,* 507 U.S. at 76–77, 113 S.Ct. at 1106.

**4.** This approach is consistent with that recently taken by the Fifth Circuit in *Louisiana Land and Exploration Co. v. Pilot Petroleum Corp.,* 900 F.2d 816, 820–21 (5th Cir.1990), *cert. denied,* 498 U.S.

897, 111 S.Ct. 248, 112 L.Ed.2d 207 (1990). In that case, the Fifth Circuit relied on *Richfield Oil Corp. v. State Bd. of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946), in striking down an Alabama excise tax on oil in the export stream of commerce. *See* discussion *infra* part III.

cumstances looking to what the owner has done in the preparation for the journey and in carrying it out. The mere power of the owner to divert the shipment already started does not take it out of interstate commerce if the other facts show that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation. . . .

*Id.* at 475–76, 47 S.Ct. at 172.

This passage was later cited in *Carson Petroleum Co. v. Vial,* 279 U.S. 95, 102–03, 49 S.Ct. 292, 293–94, 73 L.Ed. 626 (1929). In that case, the taxpayer transported oil, which was destined for foreign export, by rail to the Louisiana coast. The oil was held in a storage tank while awaiting the arrival of a ship. By storing sufficient quantities of oil in the tanks, the taxpayer was able to promptly deliver the oil on arrival of the ship, thereby avoiding costly demurrage charges. The Court first noted that "it would be impracticable to carry on the export oil business by any other method." *Id.* at 100, 49 S.Ct. at 293. The Court went on to question the precedential value of one of its earlier cases, *General Oil Co. v. Crain,* 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754 (1908), in which it had held that the temporary storage of oil, which was necessitated by the practical constraints of shipping and distributing oil, constituted a break in the continuity of transit for business purposes. *Id.* at 104, 49 S.Ct. at 294. Having rejected the applicability of *Crain,*[5] the Court then noted that "[t]here has been a liberal construction of what is continuity of the journey, in cases where the court finds from the circumstances that export trade has been actually intended and carried through," *id.* at 105–06, 49 S.Ct. at 295, and concluded that the stored oil remained in transit during its stoppage in Louisiana. *Id.* at 109, 49 S.Ct. at 296.

▆ Turning to the case before us, we are persuaded that the stoppage of VICO's goods in Harris County was attributable to an exportation, not a business, purpose. VICO purchases goods from vendors throughout the country for the exclusive use of the Indonesian joint venture. From the moment of purchase, VICO retains no control to divert the goods from their precommitted foreign destination or to sell the goods in a domestic market. Indeed, VICO has no domestic market because it is not in the business of procuring or marketing goods. Rather, VICO's duty is simply to see that the joint venture receives the goods necessary for its operations abroad.

At the export packer's facility, VICO checks the goods to ensure they meet necessary specifications for import into Indonesia, which enables VICO to resolve discrepancies with its vendors prior to export. Harris County contends that this activity serves VICO's business purpose and, therefore, breaks the goods' continuity of transit. We disagree. Indonesian law requires a preshipment inspection of the quality and quantity of the imported goods by an independent inspection agency selected by the Republic of Indonesia. *See* General Agreement on Tariffs and Trade, *Trade Policy Review—Indonesia,* Vol. 1, pp. 79–82 (1991) (citing Presidential Instruction No. 4 (1985)). We view VICO's examination of its goods as merely incidental to the inspection mandated by Indonesian law. VICO's goods are also delayed pending approval for import by the Indonesian government, a requirement that is outside of VICO's control and that serves no business purpose of VICO. Thereafter, VICO's goods are packaged for shipment, a step that must occur after approval and inspection.

While in Harris County, VICO's goods undergo only those procedures—inspection, ap-

---

**5.** The Court stated:
The [*General Oil*] court was divided and there was very vigorous dissent. The case has caused discussion, and it must be admitted that it is a close one and might easily have been decided the other way. The result was probably affected by the impression created by the original situation and the somewhat artificial rearrangement of tanks in a large entrepot for redistribution of oil to avoid previous taxability.
*Carson Petroleum,* 279 U.S. at 105, 49 S.Ct. at 295.

proval for import to Indonesia, and packaging—required for exportation. *See Carson Petroleum,* 279 U.S. at 109, 49 S.Ct. at 296 ("[T]he selection of the point of shipment and the equipment at that point were solely for the speedy and continuous export of the product abroad and for no other purpose."). VICO makes no profit from the export of the goods; its role is simply to facilitate their shipment abroad. While we realize that the delay necessary to perform these procedures is somewhat longer than that which is generally associated with a "transportation" delay, it is no longer than is necessary to get the goods on their way to Indonesia, and consequently we are persuaded that under these circumstances the delay is "due to the necessities of the journey." *See Blasius,* 290 U.S. at 9, 54 S.Ct. at 36–37. Because we view the presence of VICO's goods in Harris County as a necessary stoppage incident to their transportation abroad, we conclude that, while at the export packer's facility in Harris County, VICO's goods remain in the stream of export and immune from state taxation.

Finally, under the circumstances of this case, the tax imposed on VICO's goods transgresses the "one voice" policy of the import-export clause. On this issue, the Fifth Circuit's recent opinion in *Louisiana Land and Exploration Co. v. Pilot Petroleum Corp.,* 900 F.2d 816, 820–21 (5th Cir.1990), *cert. denied* 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 207 (1990), provides guidance. *Louisiana Land* involved an Alabama excise tax levied on jet fuel that was in transit for export to Canada. Although the court noted that *Michelin* had marked a change in the approach to import-export clause challenges, it also noted that the United States Supreme Court had not overruled the stream of export case of *Richfield Oil Corp. v. State Board of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946). *Id.* at 819. The court then determined that immunity for in-transit exports had not only survived *Michelin,* but also was consistent with it. *Id.* at 820 ("We believe, consistent with the contemporary

view of the Supreme Court, that the Import–Export Clause was specifically intended to prevent the type of taxation involved in this case").

Relying on both *Richfield Oil* and *Michelin,* the *Louisiana Land* court struck down the Alabama tax. The Fifth Circuit first determined that the tax impaired the government's ability to speak with one voice in matters of foreign commerce. *Id.* at 821 (stating "[t]his type of tax discourages foreign parties, who purchase oil from U.S. companies and refineries, from using U.S. ports to transport fuel from the United States into foreign countries"). Returning, then, to the long-standing stream of export rule, the court observed that the Alabama tax, like the California tax in *Richfield Oil,* was imposed on goods that were "the subject of foreign export of the time of taxation;" the tax was therefore unconstitutional. *Id.* at 821.

 In this case, Harris County argues that because the tax at issue is nondiscriminatory, like that in *Michelin,* it cannot be selectively applied only to goods destined for foreign transport, and consequently does not impinge upon the one voice policy. We disagree. The tax on VICO's goods impairs the federal government's ability to speak with one voice in matters of foreign commerce. While the *Michelin* court did state that "[i]t is obvious that *such nondiscriminatory property taxation* can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce," 423 U.S. at 286, 96 S.Ct. at 541 (emphasis added), it seems clear that the kind of nondiscriminatory tax to which the Court was referring was one imposed on goods that are no longer in transit.[6] We agree that there is no impairment of the one voice policy when a state tax is imposed on imported goods that have come to rest in the state of their ultimate destination. *See Diamond Shamrock,* 876 S.W.2d at 301 n. 3. However, the facts before us pose different concerns. It is one

---

**6.** "Such" refers to a nondiscriminatory tax "imposed on imported goods that are no longer in

import transit." *See Michelin,* 423 U.S. at 286, 96 S.Ct. at 541.

thing to tax property that has come to rest within the state; it is quite another to tax property that is merely passing through on its way to its final foreign destination. See *Louisiana Land*, 900 F.2d at 821 ("To permit any and every state to impose a direct tax on goods in the export stream would circumvent [the one voice] objective.").

In essence, Harris County is attempting to tax exports that will become the property of an Indonesian state agency upon arrival in Indonesia, and that are only temporarily within Harris County for the necessities of exportation, including compliance with Indonesian import requirements. The tax at issue has the potential of interfering with the United States' commercial relations with Indonesia insofar as Indonesia might turn to other countries for its imported goods or might engage in retaliatory taxation of its own exports destined for the United States. Policy affecting foreign relations should be uniform among the states and therefore determined by the federal government: this matter " 'concern[s] the exterior relations of the United States with other nations ... and should proceed exclusively from the legislative authority of the nation.' " *Louisiana Land*, 900 F.2d at 821 (quoting *Bowman v. Chicago & N.R. Co.*, 125 U.S. 465, 482, 8 S.Ct. 689, 696–97, 31 L.Ed. 700 (1888)).

We conclude that the tax on VICO's goods violates the import-export clause. We do not address VICO's additional arguments that the tax is unconstitutional under the commerce clause of the United States Constitution or that it violates Texas Tax Code § 11.01. We accordingly reverse the judgment of the court of appeals and render judgment that VICO owes no tax for the tax year 1991.

HECHT, J., joined by OWEN, J., dissenting.

HECHT, Justice, joined by OWEN, Justice, dissenting.

The Harris County Appraisal District has determined that personal property purchased by the Virginia Indonesia Co. and stored with an export packer at the Port of Houston awaiting transportation to Indonesia is subject to ad valorem taxation. VICO contends that the property is exempted from taxation by the Import–Export Clause and the Commerce Clause of the United States Constitution, and by the Texas Tax Code. The Court agrees with VICO's Import–Export Clause argument and thus does not reach VICO's other contentions.

The Court holds that the Import–Export Clause absolutely prohibits state taxation of exports whenever they are in transit to their foreign destination. The Clause, in the Court's words, gives "bright-line immunity [from state taxation] for goods in the stream of export." *Ante* at 911. This rule has the virtue of simplicity. To know if a tax is prohibited, all one must do is determine whether the property on which it falls is moving along its international course, or whether it has not yet begun, stopped upon, or ended that course. The in-transit rule also has a vice, however, which exceeds its virtue: it is simplistic. It is neither a deduction from nor a restatement of the policies embodied in the constitutional provision. In many instances, probably most, a tax allowed by the in-transit rule does not offend constitutional policies, and a tax prohibited by the rule does. But there are circumstances— and this case is an example—in which the in-transit rule dictates a result inconsistent with constitutional policy. The in-transit rule is a good rule of thumb, but it is not an Import–Export Clause litmus test.

That is why the United States Supreme Court has abandoned the exclusive use of the in-transit rule and related condensations of constitutional principles like "original package" and "export stream" as accurate or adequate substitutes for the principles themselves. The fundamental difference in Import–Export Clause jurisprudence since *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), is that the constitutional provision's limit on state taxation is now defined in every instance by the actual policies which support the limita-

tion and which it is meant to further, and not by shorthand formulae which at best only approximate and sometimes distort constitutional concerns. Whether property is in transit, and more importantly, *how* it is in transit, remains a relevant factor in assessing the validity of a tax, but it is not the only factor, nor is it determinative. The Court's adherence to an in-transit rule is at odds with the Supreme Court's modern jurisprudence, and with our recent decision in *Diamond Shamrock Refining & Marketing Co. v. Nueces County Appraisal District*, 876 S.W.2d 298 (Tex.), *cert. denied*, —— U.S. ——, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994).

The Court defends its approach as being required by *Michelin*'s predecessor cases, to which the doctrine of *stare decisis* requires obedience. I have two responses, on which I intend to elaborate. One is that the cases on which the Court relies do not support its conclusion, *Michelin* aside—and *Michelin* cannot be put aside. The other is more philosophical: no constitutional provision can be applied to do either more or less than the principles on which it is grounded require. It makes no sense to say that a tax is prohibited because it does not meet a court-made test for applying a constitutional provision, even though the tax conflicts with neither the meaning nor the purpose of the provision itself. The constitution cannot be made to say something it does not mean.

The reasoning of *Michelin* and its progeny demonstrate that the tax here does not offend the policies of the Import–Export Clause. This is not an isolated case, even in Texas. Another case pending before us involves similar facts and issues under the Commerce Clause. *Vinmar, Inc. v. Harris County Appraisal Dist.*, 890 S.W.2d 493 (Tex.App.—El Paso 1994, writ requested). I would hold that a nondiscriminatory ad valorem tax on personal property is not prohibited by the Import–Export Clause in the circumstances of the case before us. I am thus obliged to consider whether, as petitioner argues, the tax is prohibited by the Commerce Clause and the Texas Tax Code, and I would hold that it is not. Because I believe

today's decision imposes a restriction on the State's power to tax not found in the Constitution or state law, I respectfully dissent.

**I**

**A**

The Import–Export Clause states: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws...." U.S. CONST. art. I, § 10, cl. 2. The provision is not "an absolute prohibition on all taxation of imports and exports." *Department of Revenue v. Association of Washington Stevedoring Cos.*, 435 U.S. 734, 759, 98 S.Ct. 1388, 1404, 55 L.Ed.2d 682 (1978). The "central holding" of *Michelin* is "that the absolute ban is only of 'Imposts or Duties' and not of all taxes." *Id.* Harkening back to *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 6 L.Ed. 678 (1827), *Michelin* reiterated:

> "[T]he words of the prohibition ought not to be pressed to their utmost extent; ... in our complex system, the object of the powers conferred on the government of the Union, and the nature of the often conflicting powers which remain in the States, must always be taken into view.... [T]here must be a point of time when the prohibition ceases, and the power of the State to tax commences...."

*Michelin*, 423 U.S. at 296, 96 S.Ct. at 545 (quoting *Brown*, 25 U.S. at 441).

The parameters of the prohibition are two related concepts, one being "Imposts or Duties", which describes the prohibited tax, and the other "Imports or Exports", which describes the article on which the tax falls. Before *Michelin*, application of the prohibition focused almost exclusively on the latter—whether the article taxed was an import or export. This in turn depended on where the article was in the course of its journey when the tax was imposed. An article was held to be an import as long as it remained in its original package after entry into the coun-

try. *Low v. Austin,* 80 U.S. (13 Wall) 29, 34, 20 L.Ed. 517 (1871). An article was an export when it physically entered and remained in the stream of exportation. *Washington Stevedoring,* 435 U.S. at 752, 98 S.Ct. at 1400; *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 66–68, 94 S.Ct. 2108, 2111–12, 40 L.Ed.2d 660 (1974); *Empresa Siderurgica, S.A. v. County of Merced,* 337 U.S. 154, 157, 69 S.Ct. 995, 997, 93 L.Ed. 1276 (1949); *Richfield Oil Corp. v. State Bd. of Equalization,* 329 U.S. 69, 82–83, 67 S.Ct. 156, 163, 91 L.Ed. 80 (1946); *Minnesota v. Blasius,* 290 U.S. 1, 9–10, 54 S.Ct. 34, 36–37, 78 L.Ed. 131 (1933); *A.G. Spalding & Bros. v. Edwards,* 262 U.S. 66, 69, 43 S.Ct. 485, 486, 67 L.Ed. 865 (1923); *Cornell v. Coyne,* 192 U.S. 418, 427, 24 S.Ct. 383, 384, 48 L.Ed. 504 (1904); *Coe v. Errol,* 116 U.S. 517, 527, 6 S.Ct. 475, 478, 29 L.Ed. 715 (1886).

*Michelin* "adopted a fundamentally different approach to cases claiming the protection of the Import–Export Clause." *Limbach v. Hooven & Allison Co.,* 466 U.S. 353, 359, 104 S.Ct. 1837, 1841, 80 L.Ed.2d 356 (1984). *Michelin* shifted the analytical focus from the nature of the article to the nature of the tax—whether it was an impost or duty. *Id.* at 359–360, 104 S.Ct. at 1841–42; *Washington Stevedoring,* 435 U.S. at 752, 98 S.Ct. at 1400. "[T]he term 'Impost or Duty' is not self-defining and does not necessarily encompass all taxes." *Id.* at 759, 98 S.Ct. at 1404. It is defined by the policies that motivated inclusion of the provision in the Constitution. *R.J. Reynolds Tobacco Co. v. Durham County,* 479 U.S. 130, 153, 107 S.Ct. 499, 513–14, 93 L.Ed.2d 449 (1986). According to *Michelin:*

> The Framers of the Constitution ... sought to alleviate three main concerns by committing sole power to lay imposts and duties on imports in the Federal Government, with no concurrent state power: the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

423 U.S. at 285–286, 96 S.Ct. at 540–41 (footnotes omitted). I refer to the first of these policies as the "foreign relations" policy and to the third as the "state harmony" policy.

The Supreme Court has made it quite clear that "what constitutes an import or export" is no longer "the exclusive consideration" in applying the Import–Export Clause. *Washington Stevedoring,* 435 U.S. at 760, 98 S.Ct. at 1404. The argument was made in *Washington Stevedoring* that *Michelin* did not address a situation in which the articles taxed remained "a part of commerce". The Supreme Court firmly rejected that argument as an attempt to return to the pre-*Michelin* focus on the import or export nature of the property taxed:

> Rather than examining whether the taxes are "Imposts or Duties" that offend constitutional policies, the contention would have the Court explore when goods lose their status as imports and exports. This is precisely the inquiry the Court abandoned in [*Michelin* ].

*Id.* In *Limbach,* the Supreme Court reiterated:

> To repeat: we think it clear that this Court in *Michelin* specifically abandoned the concept that the Import–Export Clause constituted a broad prohibition against all forms of state taxation that fell on imports. *Michelin* changed the focus of Import–Export Clause cases from the nature of the goods as imports to the nature of the tax at issue. The new focus is not on whether the goods have lost their status as imports but is, instead, on whether the tax sought to be imposed is an "Impost or Duty."

466 U.S. at 360, 104 S.Ct. at 1842.

In today's opinion in the case before us, the Court appears to conclude that the Su-

preme Court has treated imports differently than exports, and that while *Michelin* abandoned the "original package" test for imports, it did not abandon the "stream of export" test for exports. Specifically, the Court says:

> The United States Supreme Court has yet to announce whether the new approach set forth in *Michelin* should be applied to a direct tax on imports or exports in transit. Although the *Michelin* court rejected the original package doctrine, it did not overrule *Coe v. Errol* or any of the stream of export cases, and the two doctrines are different enough that the rejection of one does not, of itself, signify the demise of the other.

*Ante* at 910–11. The Court overlooks *Washington Stevedoring*, in which the Supreme Court observed that before *Michelin*—

> the analysis in the export cases ... differed from that in the import cases. In the former, the question was when did the export enter the export stream; in the latter, the question was when did the goods escape their original package. The questions differed, for example, because an export could enter its export package and not secure tax immunity until later when it began its journey out of the country. Until *Michelin*, an import retained its immunity so long as it remained in its original package.
>
> *Despite these formal differences, the* Michelin *approach should apply to taxation involving exports as well as imports.* The prohibition on the taxation of exports is contained in the same Clause as that regarding imports. The export-tax ban vindicates two of the three policies identified in *Michelin*. It precludes state disruption of the United States foreign policy. It does not serve to protect federal revenues, however, because the Constitution forbids federal taxation of exports. U.S. CONST., Art. I, § 9, cl. 5; *see United States v. Hvoslef*, 237 U.S. 1. But it does avoid friction and trade barriers among the States. *As a result, any tax relating to*

*exports can be tested for its conformance with the first and third policies. If the constitutional interests are not disturbed, the tax should not be considered an "Impost or Duty" any more than should a tax related to imports.*

435 U.S. at 758, 98 S.Ct. at 1403 (emphasis added, footnotes omitted). The Court in today's opinion states: "Faced with the decision of whether to apply the 'stream of export' rule or to abandon it, we choose the former." Given the strong, unqualified language of *Washington Stevedoring*, I do not believe that adherence to the "stream of export" rule as the exclusive test for applying the Import–Export Clause remains an open choice.

Thus, as a general rule, a state tax on exports is not an impost or duty prohibited by the Import–Export Clause unless it conflicts with either of the two policies of the Clause which apply to exports, namely, the "foreign relations" policy and the "state harmony" policy.

**B**

The Court reads *Michelin* to leave one exception to this general rule. It "remains uncertain", the Court says, *ante* at 911, whether a direct tax on imports and exports in transit is prohibited by the Import–Export Clause even if the tax does not conflict with the principles of the Clause. Because of this uncertainty, the Court concludes that it is bound by *stare decisis* to continue to apply the "stream of export" rule to such taxes, the effect of which is to prohibit them absolutely.

The Court relies heavily on the following passage in *Michelin*:

> [T]he [Import–Export] Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State. A non-discriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by pro-

hibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed.

423 U.S. at 290, 96 S.Ct. at 543 (footnotes omitted), *ante* at 909. The Court seems to read the second sentence to say that taxes on goods merely in transit through a state are absolutely prohibited. The sentence actually says that non-discriminatory ad valorem property taxes on goods merely in transit through a state are prohibited *only* "to the extent there is any conflict whatsoever with this purpose of the Clause". The only examples suggested are "exactions which were no more than transit fees". The Supreme Court does not say that there is any conflict between the constitutional policies and a non-discriminatory ad valorem tax, and the Court's use of the word "whatsoever" suggests, if anything, that such conflict in any event is minimal.

More importantly, however, the context in which the passage appears makes it doubtful that the Supreme Court contemplated any prohibition against nondiscriminatory ad valorem taxes on imports and exports in transit except in very limited circumstances, let alone an absolute prohibition. The entire paragraph in which the passage appears reads as follows:

> Finally, nondiscriminatory ad valorem property taxes do not interfere with the free flow of imported goods among the States, as did the exactions by States under the Articles of Confederation directed solely at imported goods. Indeed, importers of goods destined for inland States can easily avoid even those taxes in today's world. Modern transportation methods such as air freight and containerized packaging, and the development of railroads and the Nation's internal waterways, enable importation directly into the inland States. Petitioner, for example, operates other distribution centers from wholesale warehouses in inland States. Actually, a quarter of the tires distributed from petitioner's Georgia warehouse are imported interstate directly from Canada. To be sure, allowance of nondiscriminatory ad valorem property taxation may increase the cost of goods purchased by "inland" consumers. But as already noted, such taxation is the *quid pro quo* for benefits actually conferred by the taxing State. There is no reason why local taxpayers should subsidize the services used by the importer; ultimate consumers should pay for such services as police and fire protection accorded the goods just as much as they should pay transportation costs associated with those goods. An evil to be prevented by the Import–Export Clause was the levying of taxes which could only be imposed because of the peculiar geographical situation of certain States that enabled them to single out goods destined for other States. In effect, the Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State. A non-discriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed.

*Michelin,* 423 U.S. at 288–290, 96 S.Ct. at 542–43 (footnotes omitted). The Supreme Court does not suggest that taxes directly on goods in transit may be absolutely prohibited; to the contrary, the Supreme Court states that "nondiscriminatory ad valorem property taxation ... is the *quid pro quo* for benefits actually conferred by the taxing State." *Id.* at 288–289, 96 S.Ct. at 542. The Import–Export Clause was intended to prohibit exaction of fees for nothing more than the privilege of moving through a state's ports. The Clause was not intended to exempt imports and exports from their fair share of the cost of police and fire protection and other such services rendered by the state through which the goods pass. Rather, the Supreme Court said, imports and exports are no more exempt from paying taxes for such services than they are from paying the cost of their own transportation.

That a non-discriminatory ad valorem tax on imports and exports might be prohibited is, in *Michelin*, only a very limited possibility. The Supreme Court stated that a tax would be prohibited only "to the extent there is any conflict whatsoever with [the] purpose of the Clause". *Id.* at 290, 96 S.Ct. at 543. Thus, even a prohibition against taxes on imports and exports in transit must be based on the policies of the constitutional provision. The Supreme Court did not suggest circumstances which would call for prohibition of such a tax:

> In any event, since prohibition of nondiscriminatory ad valorem property taxation would not further the objectives of the Import–Export Clause, only the clearest constitutional mandate should lead us to condemn such taxation. The terminology employed in the Clause—"Imposts or Duties"—is sufficiently ambiguous that we decline to presume it was intended to embrace taxation that does not create the evils the Clause was specifically intended to eliminate.

*Id.* at 293–294, 96 S.Ct. at 544. *Low v. Austin* made "crystal clear", the Supreme Court said, "that the prohibition applied only to state exactions upon imports as *imports* and did not apply to nondiscriminatory ad valorem property taxes." *Id.* at 300, 96 S.Ct. at 547.

Nevertheless, in *Washington Stevedoring* the Supreme Court held open the possibility not entirely foreclosed by *Michelin* that some nondiscriminatory ad valorem tax on imports and exports in transit might be absolutely prohibited, stating in a footnote:

> We do not reach the question of the applicability of the *Michelin* approach when a State directly taxes imports or exports in transit.
>
> ... As in *Michelin*, decided less than three years ago, we prefer to defer decision until a case with pertinent facts is presented. At that time, with full argument, the issue with all its ramifications may be decided.

435 U.S. at 757 n. 23, 98 S.Ct. at 1403 n. 23. In a concurring opinion, however, Justice Powell explained the Supreme Court's concern:

> In [*Michelin* ] this Court abandoned the traditional, formalistic methods of determining the validity of state levies under the Import–Export Clause and applied a functional analysis based on the exaction's relationship to the three policies that underlie the Clause: (i) preservation of uniform federal regulation of foreign relations; (ii) protection of federal revenue derived from imports; and (iii) maintenance of harmony among the inland States and the seaboard States. The nondiscriminatory ad valorem property tax in *Michelin* was held not to violate any of those policies, but the Court suggested that even a nondiscriminatory tax on goods merely in transit through the State might run afoul of the Import–Export Clause.

\* \* \* \* \* \*

In questioning the validity of "transit fees," the *Michelin* Court was concerned with exactions that bore no relation to services and benefits conferred by the State. Thus, the transit-fee inquiry cannot be answered by determining whether or not the tax relates to the value of the goods; instead, it must be answered by inquiring whether the State is simply making the imported goods pay their own way, as opposed to exacting a fee merely for "the privilege of moving through a State."

435 U.S. at 762–764, 98 S.Ct. at 1405–06 (citation omitted). *See also Xerox Corp. v. County of Harris, Texas,* 459 U.S. 145, 157–158, 103 S.Ct. 523, 529–30, 74 L.Ed.2d 323 (1982) (Powell, J., dissenting). The Court did not agree with Justice Powell that it had in effect already decided the question whether states could tax imports and exports in transit, but it did not disagree that the determinative issue was "whether the State is simply making the imported goods pay their own way, as opposed to exacting a fee merely for 'the privilege of moving through a State.' "

In two cases since *Washington Stevedoring,* the Supreme Court has all but said that

nondiscriminatory ad valorem taxes on imports and exports in transit are not prohibited by the Import–Export Clause except in rare circumstances. In *Limbach,* the Supreme Court reconsidered whether such a tax on imports still in their original containers—and thus still in transit—was permitted. Thirty-nine years earlier the Supreme had held that the tax was prohibited. *Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 65 S.Ct. 870, 89 L.Ed. 1252 (1945) [*Hooven I*]. In *Limbach,* following *Michelin,* the Supreme Court reached the opposite conclusion. In so doing, it explained:

> *Hooven I* held that, under the Clause, a nondiscriminatory state ad valorem tax could not be imposed until the imported goods had lost their status as imports by being removed from their original packages. This decision was among the progeny of *Low v. Austin* for it, too, was decided on the original-package doctrine. Thus *Hooven I* is inconsistent with the later ruling in *Michelin* that *such a tax is not an "Impost or Duty" and therefore is not prohibited by the Clause.* Although *Hooven I* was not expressly overruled in *Michelin,* it must be regarded as retaining no vitality since the *Michelin* decision.

466 U.S. at 360–361, 104 S.Ct. at 1841–42 (emphasis added). Thus, *Limbach* holds that a nondiscriminatory state ad valorem tax on an import still in its original package and thus in transit is not, under *Michelin,* an impost or duty prohibited by the Import–Export Clause.

In *Itel Containers International Corp. v. Huddleston,* 507 U.S. 60, 113 S.Ct. 1095, 122 L.Ed.2d 421 (1993), the Supreme Court held that a state sales tax on leases of containers owned by a domestic company and used in international shipping was not prohibited by the Import–Export Clause. To arrive at this conclusion, the Supreme Court examined whether the tax violated any of the three constitutional policies identified in *Michelin* and decided that it did not. It also rejected the taxpayer's argument that the tax was not permitted because it fell directly on goods in transit:

> For similar reasons, we reject the argument that the tax violates the prohibition on the direct taxation of imports and exports "in transit," the rule we followed in [*Richfield Oil* ]. *Even assuming that rule has not been altered by the approach we adopted in* Michelin, *it is inapplicable here.*

*Id.* at 77, 113 S.Ct. at 1106 (emphasis added). Although the Supreme Court concluded that the in-transit rule was inapplicable because the tax did not fall on goods themselves, it strongly suggested that the rule was altered by *Michelin.*

In sum, nothing in *Michelin* or any subsequent Supreme Court decision involving the Import–Export Clause—*Washington Stevedoring, Limbach* and *Itel*—suggests that any direct tax on imports or exports in transit, and particularly any nondiscriminatory ad valorem tax, is prohibited unless it conflicts with either the "foreign relations" policy or the "state harmony" policy. This is not, of course, surprising in the least. For there to be an exception to the *Michelin* rule, there must be some tax that was fully consistent with constitutional policies but nevertheless prohibited, or a tax that was inconsistent with such policies and yet permitted. Neither is possible. The very purpose of identifying the policies behind the Clause is to define its scope as precisely as possible. The constitutional policies and the scope of their prohibition must be exactly coextensive. Because those policies define the Clause's prohibition more exactly than shorthand tests like "original package" and "export stream", *Michelin* abandoned the latter altogether. This Court's adherence to the "export stream" rule as an exclusive test conflicts with both the rule and the spirit of *Michelin.*

The Court attempts to support its view with the Fifth Circuit's decision in *Louisiana Land & Exploration Co. v. Pilot Petroleum Co.,* 900 F.2d 816 (5th Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 207 (1990), which held invalid a state excise tax on jet fuel bound for a foreign country. A divided panel in that case did indicate that

the Import–Export Clause prohibits a direct tax on exports actually in transit, but it relied heavily on the rule in *Richfield Oil* which the Supreme Court undercut in *Itel* three years after *Louisiana Land* was decided. *Itel*, 507 U.S. at 77, 113 S.Ct. at 1106. *Louisiana Land* thus provides very little continued support for an absolute in-transit rule, which this Court applies today. The Fifth Circuit may nevertheless have reached the correct result, applying *Michelin*'s "foreign relations" and "state harmony" policies, for reasons I discuss below.

C

Whether goods are actually in transit is not determinative in applying the Import–Export Clause, but neither is it irrelevant. Focusing on the concept of "Imposts or Duties" need not and should not exclude all consideration of the concept of "Imports and Exports". Not only are the concepts related—imposts and duties are by definition taxes levied on imports and exports—but they are intertwined in the policies embodied in the Clause. Those policies are the sole arbiters of the validity of a tax, but among the factors to be considered is whether the goods taxed are in transit. More precisely, what is really important is not *whether* the goods are in transit, but *how*. This, I think, is what the Supreme Court meant in the *Michelin* passage which is so important to this Court's opinion:

> In effect, the Clause was fashioned to prevent the imposition of exactions which were *no more than transit fees* on the privilege of moving through a State. A non-discriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are *merely in transit* through the State when the tax is assessed.

423 U.S. at 290, 96 S.Ct. at 543 (emphasis added, footnote omitted). In other words,

the Import–Export Clause prohibits taxes which are "no more than transit fees" on goods which are "merely in transit". That is far different from saying that the Clause prohibits all taxes on goods in transit.

This Court reached the same conclusion in *Diamond Shamrock Refining & Marketing Co. v. Nueces County Appraisal District*, 876 S.W.2d 298 (Tex.), *cert. denied*, —— U.S. ——, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994). In that case we upheld an ad valorem tax on imported oil stored in Nueces County prior to the completion of its journey to other Texas destinations. We said:

> Pointing to the parties' stipulation that its crude oil is "in transit" while in Nueces County, Diamond Shamrock argues that the tax here falls within the "merely in transit" qualification. We disagree. The tax in question here does not in any way impinge on the third "harmony among the States" policy of the Import–Export Clause. Although still on its foreign import journey and *in that sense "in transit,"* the oil in question here entered *only* the State of Texas and, according to the stipulated facts, never left Texas in its crude oil form. Thus, there simply was no opportunity for harmony between the states to be disturbed. Read in context, the *Michelin* Court's qualification clearly applies only to goods in transit through the state *to or from another state* and not to goods merely in transit within the only state the goods ever enter.

876 S.W.2d at 300–301 (some emphasis added, footnotes omitted). The dispositive issue was not whether the oil could be said to be in transit in some sense, but whether it was in transit in such a way as to invoke constitutional protection from state taxation.

The idea is even clearer in our analysis of the validity of the tax under the Commerce Clause. The policies of that clause are identified in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), in what we referred to as "four prongs". Our opinion in *Diamond Shamrock* said:

Obviously, where the four prongs of *Complete Auto* are not met, goods are not taxable under the Commerce Clause whether or not they are "in transit." And, the circumstances which make the goods "in transit" may inform a court's decision that the first and fourth nexus requirements of *Complete Auto* are not met. For instance, if oil in tanks on trucks merely passed through Nueces County without stopping, it would be "in transit" in a way that would cause it to have little or no nexus with the county. But under other circumstances, as in this case, there can be sufficient nexus to support a tax even if goods are technically "in transit."

876 S.W.2d at 302 (footnote omitted). This passage is important for two reasons. First, it acknowledges that the validity of a tax depends upon its consistency with constitutional policies and not merely on whether it is in transit. Second, *how* goods are in transit is important in applying constitutional policies.

So, for example, suppose in the case before us that VICO's property, instead of being stored within the boundaries of the taxing units on January 1, had been present there only for the few hours it would have taken a truck to drive from outside the units, across them and onto a ship tied up at the dock. In such circumstances, the property would have been merely in transit through the taxing unit, and the tax little more than a transit fee. The taxing units would not even have had the opportunity to render any significant services to benefit the property. The property would be in transit in a far different way than property stored near the dock for one to six months or more on its way to the same ultimate destination.

This distinction, which was crucial in *Diamond Shamrock*, goes unmentioned in today's opinion. I do not challenge the Court's conclusion that VICO's property was in transit through Texas to Indonesia, nor do I think that its stayover at the Port of Houston was for reasons unrelated to its transportation. These are close calls but not at all

implausible. VICO's property was delayed in storage only when it was damaged, lacking parts, otherwise faulty or unsuitable, or did not meet Indonesia's stringent standards for imports. The fact is, however, that of the $380,260 worth of property VICO warehoused at the Port of Houston on January 1, 1991, more than $9,000 had been there for more than 175 days, 20% had been there for more than 45 days, and over a third of it had been there for more than a month. The record reflects that VICO stored property awaiting authorization from Indonesia for shipment. VICO does not dispute that its property benefits from police and fire protection and other governmental services provided by the taxing units, or that it pays no more than its fair share of those services. As the Supreme Court stated in *Michelin:*

> There is no reason why local taxpayers should subsidize the services used by the importer [or in this case, the exporter]; ultimate consumers should pay for such services as police and fire protection accorded the goods just as much as they should pay transportation costs associated with those goods.

423 U.S. at 289, 96 S.Ct. at 542 (footnote omitted). The same police officers who protect property permanently located in the taxing units also protect VICO's. The same fire fighters put out the fires. VICO's property is carried to and from the warehouse on streets paved and maintained with ad valorem taxes.

The Court attempts to avoid this language in *Michelin* by arguing that because the tax is assessed on property present on January 1 each year, VICO is taxed as if its property were present year round. The flaws in this argument are obvious. VICO is taxed, not as if the property assessed on January 1 were present all year long, but only as if it stored *some* property at the port throughout the year, which, in fact, it does. It might have a great deal more or less property stored at the Houston port on an average day; there is no evidence one way or the other. The use of a single date is simply an expedient to calculating the tax due. Moreover, there is

no discrimination against VICO in this respect. VICO makes no assertion that the use of January 1 discriminates against exports. Every property owner is taxed the same way, and every taxpayer, VICO included, is free to arrange its affairs to minimize the property it has on hand on January 1 in order to minimize its tax obligation.

VICO argues that governmental services can be paid for by ad valorem taxes on real property, including the warehouse in which its property is stored. The taxing units are not required to rely entirely, or even at all, on taxes on realty. They may choose to require personalty to pay its share of government services. The Court acknowledges that VICO receives governmental services for which it ought to pay something. The conclusion that the tax is unduly burdensome to international commerce presumes that VICO is paying more than its share. VICO does not make this claim, and there is no evidence to support it.

### D

The validity of the tax in this case under the Import–Export Clause should depend solely upon its consistency with the "foreign relations" and "state harmony" policies in *Michelin*. The Court goes through the motions of this analysis, but its conclusions are all dictated by its belief that taxes on goods in transit always contravene these policies. The Court does not assess the effect of the tax in this case on constitutional policies independent of its in-transit rule.

What I have called the "foreign relations" policy was stated by the Court in *Michelin* as follows:

the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power....

423 U.S. at 285, 96 S.Ct. at 540 (footnote omitted). The ad valorem tax in this case does not interfere with the federal govern-

ment's foreign relations. It is imposed on all property present in the taxing units on a certain date for the purpose of paying for government services which benefit the property. While this indisputably affects the price property is sold for, it is only an incidental effect common to all property. In *R.J. Reynolds*, the Supreme Court wrote of a nondiscriminatory ad valorem tax on imports:

If imposition of the tax happens to have the "incidental effect" ... of discouraging some importation of foreign goods, prohibiting this result is not a function of the Import–Export Clause.

479 U.S. at 154, 107 S.Ct. at 514.

A foreign government simply has no more reason to think that the goods it imports will be exempt from paying for government service than that they will be from paying transportation costs. The Court surmises that "Indonesia might turn to other countries for its imported goods or might engage in retaliatory taxation of its own exports destined for the United States." *Ante* at 915. Again, Indonesia, like any other purchaser, cannot reasonably expect to escape paying for government services benefiting its purchases, either as a direct expense or a component of the price, no matter what country it turns to.

The "state harmony" policy was stated in *Michelin* as follows:

harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

423 U.S. at 285–286, 96 S.Ct. at 541 (footnote omitted). Requiring property to pay for the benefits of government services is not a prerogative limited to seaboard states. The taxing units in this case enjoy no more favorable a position than the taxing units in any other state. To the contrary, invalidating the tax in this case discriminates against the port because it is a port.

The tax in this case is different from the tax invalidated by the Fifth Circuit in *Louisiana Land.* That was an excise tax, a sales tax imposed specifically on jet fuel. 900 F.2d at 817 n. 1. The tax in this case is a completely nondiscriminatory ad valorem tax imposed on all personalty as in *Michelin.* An argument can be made that one state's sales tax on certain products may impact foreign relations or harmony among the states more than an ad valorem tax on all kinds of property. Also, an excise tax may fall on property that is merely moving through a state without a sufficient nexus there to warrant taxation. In any event, the tax expressly identified in *Michelin* as being outside constitutional prohibition is a nondiscriminatory ad valorem tax.

Since the tax on VICO's property does not conflict with the policies of the Import–Export Clause identified in *Michelin,* I would conclude that the tax is not prohibited by that provision.

## II

The Foreign Commerce Clause empowers Congress "To regulate Commerce with foreign Nations." The United States Supreme Court has construed this Clause not only as a grant of power to the Congress but also as a negation of power in the states. *See Itel,* 507 U.S. at 80–81, 113 S.Ct. at 1107–1108 (Scalia, J., concurring). As with the Import–Export Clause, the Supreme Court has defined the scope of the prohibition of this Clause based upon the policies it serves. The test includes four factors which apply to interstate and foreign commerce both, *Complete Auto Transit,* 430 U.S. at 277–279, 97 S.Ct. at 1078–79, plus two additional factors unique to foreign commerce, *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 451, 99 S.Ct. 1813, 1823, 60 L.Ed.2d 336 (1979). *Itel,* 507 U.S. at 71–72, 113 S.Ct. at 1103. A tax passes muster under the *Complete Auto* test if it is: (1) applied to an activity with a substantial nexus with the taxing state; (2) fairly apportioned; (3) nondiscriminatory; and (4) fairly related to the services provided by the State. *Complete*

*Auto,* 430 U.S. at 279, 97 S.Ct. at 1079; *Diamond Shamrock,* 876 S.W.2d at 301. Taxation on international commerce, because it implicates additional constitutional concerns, is subjected to two additional inquiries: whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and whether the tax prevents the federal government from speaking with one voice when regulating commercial relations with foreign governments. *Japan Line, Ltd.,* 441 U.S. at 451, 99 S.Ct. at 1823; *Diamond Shamrock,* 876 S.W.2d at 301.

The tax in this case meets all six factors. The goods clearly have a nexus to this state. They are present for relatively prolonged periods during which they receive local services such as police and fire protection. The tax is nondiscriminatory. The same tax applies to all personal property. There is no evidence that the tax is not fairly apportioned insofar as it falls only on those goods here on January 1. See *Japan Line,* 441 U.S. at 445, n. 8, 99 S.Ct. at 1820 n. 8. Rather, it is undisputed that VICO has goods present in Harris County throughout the year. There is no evidence that the tax is not fairly related to the services provided. There is no evidence that the goods would be subject to multiple taxation here and abroad, or for that matter, that they would be subject to multiple taxation here and in other states. And finally, as already noted, there is no evidence that imposition of this nondiscriminatory ad valorem tax would be a tariff or tax interfering with the federal government's ability to speak with one voice in foreign relations. The tax does not fall on goods because of their place of destination, but is simply based on their presence here on the day of assessment. Their presence or absence on that date could be manipulated by a taxpayer to its advantage.

The tax in this case impinges no more upon the Foreign Commerce Clause than the tax we upheld in *Diamond Shamrock.* I would conclude that it is not prohibited by that Clause.

## III

Section 11.01(c)(1) of the Texas Tax Code states: "This state has jurisdiction to tax

tangible personal property if the property is ... located in this state for longer than a temporary period...." The taxing units concede that this is the only provision of state law that allows them to tax VICO's property. VICO argues that its property is only temporarily present within the taxing units' boundaries and thus not subject to their taxation.

In *Greyhound Lines, Inc. v. Board of Equalization*, 419 S.W.2d 345, 349 (Tex. 1967), we stated:

> To acquire a tax situs of its own in a particular state, it is not necessary that tangible personal property be situated in the state with absolute permanency, or that it be there situated with no intention on the part of the owner to remove it; it is enough to fix tax situs that its situation have a degree of permanency which will distinguish it from property which is in the state on a purely temporary or transitory basis.

In that case we held that Greyhound buses were taxable at that company's principal place of business in Texas, which was Fort Worth, even though the buses were constantly moving into, across and out of the State.

While we have been cited to no case involving circumstances more like those of the present case, I would hold that VICO's property is in the State for more than a temporary period. Even though it is destined for Indonesia from before the moment it enters the State and is warehoused at the Port of Houston for only as long as is necessary to prepare it for transportation, that period is almost always a number of days and often a number of months. One could argue that article VIII, section 1-j of the Texas Constitution, exempting property within the State for less than 175 days in certain circumstances, sets a standard for what is temporary under section 11.01(c)(1), but that argument is not made by the parties here and I do not address it. I would conclude that taxation of VICO's property does not violate section 11.01(c)(1) of the Tax Code.

\* \* \* \* \* \*

The court of appeals held that neither the Import–Export Clause, the Foreign Commerce Clause, nor section 11.01(c)(1) of the Tax Code prohibited the taxing authorities from taxing VICO's property. It remanded the case to consider other arguments made by VICO pertaining to its claim of freeport exemption under the Tax Code and the Texas Constitution. I agree, for the reasons explained by the court of appeals, that the case should be remanded. I would therefore affirm the judgment of the court of appeals. Accordingly, I respectfully dissent.