

# NUMBER 13-24-00590-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SAN PATRICIO COUNTY
APPRAISAL DISTRICT,                                              Appellant,

v.

GUNVOR USA LLC,                                                   Appellee.

## ON APPEAL FROM THE 156TH DISTRICT COURT
## OF SAN PATRICIO COUNTY, TEXAS



**NUMBER 13-25-00027-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI – EDINBURG**

---

**SAN PATRICIO COUNTY**
**APPRAISAL DISTRICT,**                                                    **Appellant,**

**v.**

**DEVON GAS SERVICES, L.P.,**
**AS AGENT FOR GLENCORE LTD.,**                                    **Appellee.**

---

**ON APPEAL FROM THE 36TH DISTRICT COURT**
**OF SAN PATRICIO COUNTY, TEXAS**

---

# OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca**
**Opinion by Justice Fonseca**

The Import-Export Clause of the United States Constitution provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws . . . ." U.S. CONST. art. I, § 10, cl. 2. In these two appeals, the trial courts held that inventories

2

of crude oil held in coastal tank farms in San Patricio County are exempt from State property tax under this clause. By two issues in each case, appellant San Patricio County Appraisal District (the District) argues the trial court erred by "fail[ing] to enforce the rules of discovery" and by granting summary judgment in favor of the taxpayers, appellees Gunvor USA LLC (Gunvor)[1] and Devon Gas Services, L.P., as agent for Glencore Ltd. (Devon).[2] In the case concerning Devon, the District also raises a third issue complaining that the trial court failed to rule on its objections to evidence. We affirm.

## I. BACKGROUND

Crude oil is delivered via pipeline from wells around the region to the Pin Oak Taft/Midway Junction (Taft Junction), located near Taft in San Patricio County, and it is stored in tanks there until it can be transferred to an export terminal in Corpus Christi, where it is loaded onto tanker ships. For tax year 2023, the District appraised Devon's taxable property to include 219,546 barrels of crude oil stored at Taft Junction and valued at over $17 million. *See* TEX. TAX CODE § 21.02(a)(1) (providing generally that "tangible personal property is taxable by a taxing unit if . . . it is located in the unit on January 1 for more than a temporary period"). It appraised Gunvor's taxable property to include 428,576 barrels stored at a similar tank farm at South Texas Gateway Terminal in Ingleside, valued at over $38 million.

Both appellees protested with the local appraisal review board, arguing the oil is exempt from ad valorem taxation under the Import-Export Clause and the Texas Tax Code. *See* U.S. CONST. art. I, § 10, cl. 2; TEX. TAX CODE §§ 11.12 ("Property exempt from

---

[1] Appellate court cause number 13-24-00590-CV.

[2] Appellate court cause number 13-25-00027-CV.

ad valorem taxation by federal law is exempt from taxation."), 41.41(a) (stating a property owner is entitled to protest an appraisal district's decision to the appraisal review board). The appraisal review board denied appellees' protests, and appellees timely filed the underlying suits for judicial review. *See* TEX. TAX CODE § 42.21(h). In August of 2024, each appellee filed a motion for summary judgment making the same arguments and attaching evidence. Devon's evidence included an affidavit by Greg Horne, its Vice President of Marketing and Midstream, stating in relevant part:

5. Glencore Ltd. (Glencore) is an international crude oil trader. Glencore entered into a Master Purchase and Sale Marketing Agreement with Devon to market, sell, and export crude oil that Devon produces from the Permian Basin to customers in international markets.

6. Devon has been appointed as the agent of record on behalf of Glencore . . . .

7. During calendar years 2022 through 2023, an affiliate of Devon produced West Texas Intermediate crude oil from the Permian Basin in Texas and New Mexico. All the barrels of crude oil relevant to this lawsuit . . . were produced by Devon's affiliate and transported to the Corpus Christi Ship Channel by Devon exclusively for the purpose of fulfilling orders Glencore received from buyers seeking cargos of unrefined West Texas Intermediate crude oil to be delivered to foreign destinations (the WTI).

8. Devon utilized third-party operated common carrier pipelines to transport the WTI to the Corpus Christi Ship Channel. All the WTI was sold to be delivered to foreign destinations. From 2022 to 2023 when the WTI arrived in San Patricio County, it was first delivered into the Pin Oak Taft/Midway Junction (Taft Junction) located in San Patricio County and then transported on to the Pin Oak Corpus Christi Terminal (Corpus Christi Export Terminal) located in Nueces County along the Corpus Christi Ship Channel for loading on vessels for exportation.

9. Title to the WTI passes from Devon to Glencore when it enters Taft Junction.[3] Thereafter[,] in order to continue the uninterrupted

_____

[3] Despite this provision, Devon has never disputed that it owned the subject oil at all times relevant to this case.

4

transport of the WTI[,] Glencore utilized (i) above-ground tanks at Taft Junction and the Corpus Christi Export Terminal (the Export Tanks) and (ii) the pipelines connecting these Export Tanks to the loading arms located on the vessel docks to load the WTI on various classes of non-Jones Act vessels.

10. The Corpus Christi Export Terminal will not bring a vessel to berth unless the exporting customer (like Glencore) has sufficient volume of product to completely load the vessel without having to await arrival of the final barrels of WTI. It is the Corpus Christi Export Terminal—not the exporting customer—that calls in the vessel to berth. Glencore could not export the WTI through the Corpus Christi Export Terminal without utilizing the Export Tanks.

11. The quantity of WTI in the Export Tanks at any given time was always waiting on Glencore's next laycan window[4] upon which Glencore's chartered vessel was called to berth by the Corpus Christi Export Terminal after there was sufficient accumulation to load the relevant vessel.

12. During calendar years 2022 through 2023, Glencore always exported the WTI in the Export Tanks to international markets and never diverted any of the WTI for domestic use.

Devon's affidavit was accompanied by bills of lading and cargo manifests indicating that three "non-Jones Act vessel[s]" containing over two million barrels of crude oil in total departed the Corpus Christi Export Terminal in January of 2023, bound for Canada, Denmark, and China, respectively. Gunvor filed a substantially similar affidavit.[5]

---

[4] "In LNG or crude oil shipping, the laycan is the date range during which a vessel must arrive at the loading port to load its cargo. If the vessel misses the laycan window, it can be refused loading." GUNVOR GROUP, https://gunvorgroup.com/glossary/cargo-laycan/ (last visited Jan. 7, 2026).

[5] Specifically, Brian Bormaster, Gunvor's "Business Developer – Crude," averred in relevant part:

6. Gunvor utilized third-party operated common carrier pipelines to transport the WTI to San Patricio County, Texas. The vast majority of WTI was sold to be delivered to foreign destinations before entering the pipelines in the Permian Basin. All the WTI was sold to be delivered to foreign destinations. From 2021 through 2023 when the WTI arrived in San Patricio County, it was delivered into the South Texas Gateway (STG) crude oil export terminal located along the Corpus Christi Ship Channel (the Export Terminal).

7. At the Export Terminal, Gunvor utilized (i) above ground storage tanks (the Export Tanks) for staging the WTI and (ii) the pipelines connecting these Export Tanks to the loading arms located on the vessel docks to load the WTI on various classes

In each case, the District filed a response and objected to some of appellees' evidence.[6] The District argued in part that the oil was taxable, despite the fact that it was bound for export, because there were "incredibly large volumes of oil constantly present" at both tank farms. As evidence, it attached monthly reports indicating that the Taft Junction tanks used by Devon contained an average of 154,000 barrels of crude oil in the year preceding the appraisal date, and that they never contained less than 92,000 barrels during that time period. As to Gunvor, the District attached monthly reports indicating that its South Texas Gateway tanks contained an average of over 2.8 million barrels in the year preceding the appraisal date and never contained less than 1.9 million barrels during that time period. These amounts included "tank heels," or the minimum volumes which must be retained in each tank at all times in order for them to remain operational. The

---

of non-Jones Act vessels.

8. The Export Terminal will not bring a vessel to berth unless the exporting customer (like Gunvor) has sufficient volume of product either fully landed in the Export Tanks or sufficiently landed in the Export Tanks with the remainder in transit to land in the Export Tanks to completely load the vessel without having to await arrival of the final barrels of WTI. It is the Export Terminals—not the exporting customer—that calls in the vessel to berth. Gunvor could not export the WTI through the Export Terminal without utilizing the Export Tanks to aggregate and stage the WTI for its next laycan window.

9. The quantity of WTI in the Export Tanks at any given time was always waiting on Gunvor's next laycan window upon which Gunvor's chartered vessel was called to berth by the Export Terminal after there was sufficient accumulation to load the relevant vessel.

10. During calendar years 2021 through 2023, Gunvor always had unfulfilled orders for future cargos of WTI in quantities that exceeded the quantities of WTI staged in the Export Tanks. Gunvor exported all the WTI in the Export Tanks to international markets and never diverted any of the WTI for domestic use.

11. During calendar years 2021 through 2023, Gunvor did not refine the WTI in any way or at any point during its transit from the point of purchase through the Export Terminals and onto the non-Jones Act vessels.

Both Horne and Bormaster noted that, unlike San Patricio County, Nueces County determined the oil to be exempt from taxation.

[6] The records contain no explicit rulings on the District's objections to evidence.

District attached deposition testimony by Pin Oak's vice president stating that "around 46,000" barrels need to remain at the bottom of the Taft Junction tanks, and that the customer is responsible for maintaining those amounts. South Texas Gateway's director of crude oil exports testified in deposition that the minimum volume was "[a]pproximately 30 to 35,000 barrels per tank" at that facility; that customers are required to contribute to the minimum; and that the precise amount of that contribution "varies greatly by customer and how their contracts are structured."

Appellees filed replies to the District's responses. In September and October of 2024, the trial courts granted appellees' summary judgment motions and declared that the subject oil is exempt from taxation. In November of 2024, the trial court denied motions for new trial filed by the District in both cases. These appeals followed.

## II.     PRELIMINARY ISSUES

### A.     Motions to Compel Discovery

By its first issue in both appeals, the District argues that the trial courts erred by "fail[ing] to enforce the rules of discovery." The record reflects that the District filed motions to compel discovery in both cases, arguing that appellees failed to answer interrogatories and requests for production, and seeking orders compelling responses. The motion concerning Gunvor was granted in part, though the District argues Gunvor did not comply with the ruling. The motion concerning Devon was not ruled upon.

In response, Gunvor contends that the District inadequately briefed the issue because it did not supply "record citations identifying the alleged error committed by the trial court"; did not "demonstrate how it properly preserved the issue for appeal"; did not identify the applicable standard of review; and did not "provide argument and authorities

7

relevant to the standard of review." We agree. In its brief, the District points to the trial court's order partially granting and partially denying its motion to compel as to Gunvor, but it is not clear whether it is complaining of the trial court's partial denial of the motion or of Gunvor's failure to comply with the order to the extent the motion was granted. Either way, the District does not refer to any authority concerning an applicable standard of review or demonstrating that error occurred.[7] *See* TEX. R. APP. P. 38.1(i).

Moreover, the only discussion in the District's brief regarding how it was harmed by any discovery ruling is as follows:

> [A]dequate discovery would confirm that Gunvor's oil was constantly present in massive quantities in the tank farms in San Patricio County during relevant times. . . . Discovery would very likely show that Gunvor contributed to oil in tank bottoms that must be present at all times for the tanks to function properly. Furthermore, adequate discovery would very likely show that Gunvor's oil came from Texas and was thus not merely flowing [through] the state.

But the facts which the District identifies as potentially established by more complete discovery are not in significant dispute. The uncontroverted reports attached to the District's summary judgment response established that the tanks at issue contained at least 1.9 million barrels for every month in the year prior to the appraisal date. South Texas Gateway's representative testified that the facility has a "commingled storage system" but serves fewer than twenty shippers. And Gunvor has never disputed that it owns the quantity of oil attributed to it by the District; the only question is whether the oil

---

[7] The only legal authority cited by the District in its discussion of this issue is as follows:

"The summary judgment rule clearly contemplates that the trial court will allow parties a reasonable opportunity to conduct discovery before rendering summary judgment." *Coleman v. Winn-Coleman, Inc.*, 110 S.W.3d 104, 111 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "Discovery is designed to 'allow the litigants the fullest knowledge of the facts and issues prior to trial.'" *Chapa v. Garcia*, 848 S.W.2d 667, 668 (Tex. 1992) (citing *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 553 (Tex. 1990) (orig. proceeding)).

is exempt from taxation as an export. Thus, even if the trial court erred in its discovery rulings, the District has not established that any error was reversible. *See* TEX. R. APP. P. 44.1(a) (providing that a judgment in a civil case may not be "reversed on the ground that the trial court made an error of law" unless we conclude the error complained of: "(1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals.").

Devon, on the other hand, argues that the issue was not preserved because the District did not object to the trial court's failure to rule on its motion to compel. We agree. To preserve a complaint for appellate review, the record must show that it was first "made to the trial court by a timely request, objection, or motion" and that "the trial court: (A) ruled on the request, objection, or motion, either expressly or implicitly; or (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a). Here, in the Devon case, the District neither obtained an adverse ruling on its motion to compel nor objected to the trial court's failure to rule at any point. Accordingly, the issue has not been preserved for our review. *See id.*; *Harris Cent. Appraisal Dist. v. Hous. Pipe Line Co.*, 706 S.W.3d 568, 577 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (holding that appellant "cannot raise evidentiary objections on appeal that it was required to preserve in the trial court" because it "did not object to the trial court's failure to rule"); *Alejandro v. Bell*, 84 S.W.3d 383, 388 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (holding issue was preserved where appellant "complained in his motion for new trial of the trial court's refusal to rule").

The District's first issues are overruled.

**B.      Failure to Rule on Evidentiary Objections**

By its third issue in the appeal concerning Devon, the District argues the trial court erred by failing to rule on its objections to Devon's summary judgment evidence. The record reflects that the District made twelve specific objections in writing on October 1, 2024. Several weeks after the trial court ruled on the summary judgment motions, the District filed a written pleading on January 17, 2025, asserting that the trial court "has failed to set the [o]bjections for a hearing or rule on them."

Devon argues that the issue has been waived as not preserved and inadequately briefed. We agree on both points. As noted above, a party must object to a trial court's failure to rule in order to preserve an issue for appeal. *See* TEX. R. APP. P. 33.1(a)(2)(B); *Harris Cent. Appraisal Dist.*, 706 S.W.3d at 577; *Alejandro*, 84 S.W.3d at 388. Here, the District objected to the trial court's failure to rule on the evidentiary issues, but it only did so fifty-six days after the trial court denied the District's motion for new trial, by which time the court's plenary power over the case had already expired.[8] *See* TEX. R. CIV. P. 329b(e) (providing that a court's "plenary power to grant a new trial or to vacate, modify, correct, or reform a judgment" expires thirty days after a timely-filed motion for new trial is denied). We agree with Devon that the objection was untimely for that reason. *See Burbage v. Burbage*, 447 S.W.3d 249, 257 (Tex. 2014) (noting that, to effectively preserve error, an objection "must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem").

Further, the District has again failed to explain how it was harmed by the trial

---

[8] The District's motion for new trial did not complain about the trial court's evidentiary rulings or its failure to rule.

court's failure to rule. *See* TEX. R. APP. P. 44.1(a). After reiterating the substantive arguments it made in its evidentiary objections before the trial court,[9] the District merely states: "Without the evidence described above, all of which is objectionable, Devon cannot establish its entitlement to judgment." In the absence of any further description of how the trial court's failure to rule affected the case, we cannot conclude that any error is reversible. *See id.* R. 38.1(i). We overrule the District's third issue in appellate cause number 13-25-00027-CV.

### III.    SUMMARY JUDGMENT

By its second issue in both appeals, the District argues the trial court erred by granting summary judgment declaring the subject oil exempt from taxation.

### A.    Standard of Review and Applicable Law

The trial court's summary judgment ruling is reviewed de novo. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). We view the evidence in the light most favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts against the motion. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (per curiam); *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009).

A movant for traditional summary judgment has the burden to establish that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). If the non-movant produces more than a scintilla of evidence to raise a fact issue on the challenged elements, then summary judgment is improper. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014);

---

[9] We note that, of the twelve specific evidentiary objections made by the District, two concern statements made in Devon's motion rather than evidence attached to the motion, and three complain that certain statements in Horne's affidavit were "contradict[ed] by other evidence," which is not germane to the statements' admissibility at the summary judgment stage of proceedings.

11

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *King Ranch, Inc.*, 118 S.W.3d at 751 (quoting *Merrell Dow Pharms. Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

## B.    Import-Export Clause

### 1.    Historical Application

For much of the nation's history, the Import-Export Clause was interpreted broadly to forbid any type of state taxation on any property which is properly characterized as an "import" or "export." *See, e.g.*, *Low v. Austin*, 80 U.S. 29, 34 (1871) ("Whilst retaining their character as imports, a tax upon them, in any shape, is within the constitutional prohibition. The question is not as to the extent of the tax, or its equality with respect to taxes on other property, but as to the power of the State to levy any tax."). Whether a product was properly characterized as an "import" was, in turn, based on whether it remained in the importer's possession or control or remained in the same containers in which it was brought into the country (the "original package doctrine"). *See id.* ("[G]oods imported do not lose their character as imports, and become incorporated into the mass of property of the State, until they have passed from the control of the importer or been broken up by him from their original cases."); *Brown v. Maryland*, 25 U.S. 419, 441–42 (1827) ("[G]enerally, . . . when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has,

12

perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution.").

On the other hand, a product was properly characterized as an "export" only upon "its physical entry into the stream of exportation." *Kosydar v. Nat'l Cash Reg. Co.*, 417 U.S. 62, 71 (1974) (citing *Coe v. Errol*, 116 U.S. 517, 527 (1886)).[10] Courts deemed this to occur only when goods "have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." *Id.* at 66–67 (quoting *Coe*, 116 U.S. at 527); *see Joy Oil Co. v. State Tax Comm'n of Mich.*, 337 U.S. 286, 288 (1949) (holding that gasoline held in storage was taxable because it "might have been diverted to domestic markets without disruption of any existing arrangement for its transshipment and without even breach of any contractual commitment to a foreign purchaser"). "The means of shipment are unimportant so long as the certainty of the foreign destination is plain." *Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 82–83 (1946) (finding oil stored in a vessel was

---

[10] In *Kosydar*, the Court explained the benefits of a bright-line rule:

> It may be said that insistence upon an actual movement into the stream of export in the case at hand represents an overly wooden or mechanistic application of the *Coe* doctrine. This is an instance, however, where we believe that simplicity has its virtues. The Court recognized long ago that even if it is not an easy matter to set down a rule determining the moment in time when articles obtain the protection of the Import-Export Clause, "it is highly important, both to the shipper and to the State, that it should be clearly defined so as to avoid all ambiguity or question."

*Kosydar v. Nat'l Cash Reg. Co.*, 417 U.S. 62, 71 (1974) (quoting *Coe v. Errol*, 116 U.S. 517, 526 (1886)); *see A.G. Spalding & Bros. v. Edwards*, 262 U.S. 66, 69 (1923) ("[W]e have to fix a point at which, in view of the purpose of the Constitution, the export must be said to begin. As elsewhere in the law there will be other points very near to it on the other side, so that if the necessity of fixing one definitely is not remembered any determination may seem arbitrary.").

exempt even though "at the time of the delivery the vessel was in California waters and was not bound for its destination," noting that "when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use"); *see Empresa Siderurgica v. County of Merced*, 337 U.S. 154, 156–57 (1949) ("[I]t is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it. . . . It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice.").

Under the "stream of export" doctrine,

> [o]nce exportation has begun, goods retain their "export" status, and thus remain exempt from state taxation as long as they are in transit. Temporary interruptions "due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement" do not break the continuity of transit; however, stoppages that serve the owner's business purpose interrupt the goods' continuity of transit, rendering them subject to the taxing power of the state.

*Va. Indon. Co. v. Harris Cnty. Appraisal Dist.* (*VICO*), 910 S.W.2d 905, 908 (Tex. 1995) (citing *Minnesota v. Blasius*, 290 U.S. 1, 9–10 (1933)).

### 2. *Michelin*

In *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 301 (1976), the United States Supreme Court "adopted a fundamentally different approach to cases claiming the protection of the Import-Export Clause." *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 359 (1984). There, a Georgia county assessed ad valorem property taxes on tires and tubes which had been imported from France and Canada and were being stored at Michelin's wholesale distribution warehouse in the county. *Michelin*, 423 U.S. at 278–79.

The products were destined for resale to customers at one of Michelin's franchised dealers in the region. *Id.* at 280. Relying on *Low*, the Georgia Supreme Court first summarily rejected Michelin's argument that "an annual ad valorem tax is not a tax . . . within the meaning of the federal constitutional provision." *Wages v. Michelin Tire Corp.*, 214 S.E.2d 349, 355 (Ga. 1975), *aff'd*, 423 U.S. 276. Then, applying the "original package" doctrine, the Georgia court held that the "unpackaged" tires lost their status as "imports" and were subject to taxation, but the tubes—which remained in the original "corrugated cartons" in which they were shipped—were exempt. *Id.*[11]

The United States Supreme Court affirmed the Georgia court's decision "without addressing the question whether [it] was correct in holding that the tires had lost their status as imports." *Michelin*, 423 U.S. at 279. Instead, the Court reframed the issue and held that "nondiscriminatory ad valorem property taxes are not prohibited by the Import-Export Clause" because they are not "Imposts or Duties" within the meaning of the clause. *Id.* at 301.[12] It reasoned as follows:

> The Framers of the Constitution . . . sought to alleviate three main concerns by committing sole power to lay imposts and duties on imports in the Federal Government, with no concurrent state power: [1] the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign

---

[11] The Georgia court observed that the "original package" doctrine

has been almost universally applied, in a mechanical way, for about 150 years. The great weight of authority makes a vast distinction between goods shipped in packaging, such as crates or cartons, and goods shipped in bulk. Packaged imports retain their status as imports, and are not subject to taxation. Bulk imports that have been mingled with other bulk imports, sorted, and arranged for sale do not retain their status as imports, and they are subject to taxation.

*Wages v. Michelin Tire Corp.*, 214 S.E.2d 349, 355 (Ga. 1975), *aff'd*, 423 U.S. 276 (1976) (noting that "[w]hat we do in this case is to merely 'draw a line,' and it is, admittedly, a difficult line to draw").

[12] The United States Supreme Court later noted that, although the framers granted Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises" in the Commerce Clause, they limited the Import-Export Clause's ban to "Imposts or Duties," thereby indicating an intent to restrict the scope of that clause. *Dep't of Revenue of State of Wash. v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734, 759 (1978).

relations, could not be implemented by the States consistently with that exclusive power; [2] import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and [3] harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

*Nothing in the history of the Import-Export Clause even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on imported goods that are no longer in import transit was the type of exaction that was regarded as objectionable by the Framers of the Constitution*. For such an exaction, unlike discriminatory state taxation against imported goods as imports, was not regarded as an impediment that severely hampered commerce or constituted a form of tribute by seaboard States to the disadvantage of the other States.

It is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the Clause's prohibition. By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in a manner inconsistent with federal regulation.

Nor will such taxation deprive the Federal Government of the exclusive right to all revenues from imposts and duties on imports and exports, since that right by definition only extends to revenues from exactions of a particular category; if nondiscriminatory ad valorem taxation is not in that category, it deprives the Federal Government of nothing to which it is entitled. Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, such property taxes are taxes by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective wealth; there is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods. *The Import-Export Clause clearly prohibits state taxation based on the foreign origin of the imported goods, but it cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies.* It may be that such taxation could diminish federal impost revenues to the extent its economic burden may discourage purchase or importation of foreign goods. The prevention or avoidance of this incidental effect was not, however, even remotely an objective of the Framers in enacting the prohibition.

16

. . . .

> [S]ince prohibition of nondiscriminatory ad valorem property taxation would not further the objectives of the Import-Export Clause, only the clearest constitutional mandate should lead us to condemn such taxation. The terminology employed in the Clause "Imposts or Duties" is sufficiently ambiguous that we decline to presume it was intended to embrace taxation that does not create the evils the Clause was specifically intended to eliminate.

423 U.S. 276 at 285–87, 293–94 (emphasis added, internal citations and quotations omitted). *Michelin* explicitly overruled *Low* to the extent that it conflicted with its holding. *Id.* at 279.[13] However, it was careful to note that the tires at issue "were no longer in transit," and it suggested that the result would be different in a case involving "goods which are merely in transit through the State when the tax is assessed." *Id.* at 290.[14]

The Court applied *Michelin* two years later in *Department of Revenue of State of Washington v. Ass'n of Washington Stevedoring Cos.*, 435 U.S. 734 (1978). There, Washington assessed a business and occupation tax on stevedoring, i.e., "the business of loading and unloading cargo from ships." *Id.* at 737. The United States Supreme Court

---

[13] Because it reframed the issue, the *Michelin* Court did not explicitly abrogate the "original package" doctrine as a mechanism for determining whether a product has retained its character as an "import." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 279, 301 (1976). Similarly, because it was not an export case, *Michelin* did not explicitly reject the "stream of export" doctrine as a mechanism for determining whether a product has attained the character of an "export." Instead, the crux of *Michelin* is that whether a product is considered an "import" or "export" is irrelevant, because regardless of how the goods are characterized, a tax thereon will pass constitutional muster if and only if it advances the objectives of the Import-Export Clause. *See id.* at 294.

[14] The Court explained:

> An evil to be prevented by the Import-Export Clause was the levying of taxes which could only be imposed because of the peculiar geographical situation of certain States that enabled them to single out goods destined for other States. In effect, the Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State. A non-discriminatory ad valorem property tax obviously stands on a different footing, and *to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed*.

*Id.* at 289–90 (footnotes omitted and emphasis added).

17

first held generally that "the *Michelin* approach should apply to taxation involving exports as well as imports." *Id.* at 758 (citations and footnotes omitted). And it found that the Washington tax was assessed on "transportation services . . . necessary to the import-export process." *Id.* at 757. Nevertheless, because the tax did not "relate[] to the value of the goods," the Court held it "[cannot] be considered taxation upon the goods themselves." *Id.* (citing *Canton R.R. Co. v. Rogan*, 340 U.S. 511, 514–15 (1951) ("The difference is that in the present case the tax is not on the goods, but on the handling of them at the port. An article may be an export and immune from a tax long before or long after it reaches the port. But when the tax is on activities connected with the export or import the range of immunity cannot be so wide.")). Moreover, the Washington tax "violates none of the constitutional policies identified in *Michelin*." *Id.* at 761. Thus, even though the imported and exported goods were still "in transit" at the time the tax was assessed, the tax was "not among the 'Imposts or Duties' within the prohibition of the Import-Export Clause." *Id.* at 755 ("Under the analysis of *Michelin*, then, the application of the Washington business and occupation tax to stevedoring violates no Import-Export Clause policy and therefore should not qualify as an 'Impost or Duty' subject to the absolute ban of the Clause."). The Court explicitly declined to "reach the question of the applicability of the *Michelin* approach when a State directly taxes imports or exports in transit." *Id.*

### 3.  *Diamond Shamrock*

The constitutionality of direct State taxation of crude oil was at issue before the Texas Supreme Court in *Diamond Shamrock Refining & Marketing Co. v. Nueces County Appraisal District*, 876 S.W.2d 298 (Tex. 1994). That case involved imported oil stored at

the Harbor Island storage facility in Nueces County, which was appraised to be part of Diamond Shamrock's taxable property in the county for tax years 1988, 1989, and 1990. *Id.* at 298. "The oil in question was shipped from foreign sources through the Gulf of Mexico, off-loaded at [Harbor Island], held there in tanks, and transmitted by pipeline to Diamond Shamrock's refinery in Three Rivers, Live Oak County, Texas." *Id.* at 299. Some of the oil "was always present at Harbor Island between 1987 and 1990, although the particular oil in the tanks on January 1, 1988, 1989 and 1990 was actually present for a maximum period of 12 to 25.3 days." *Id.* (noting that "[t]he government provides services to the Harbor Island facility in general and to Diamond Shamrock's crude oil in particular"). This Court held that the tax was permissible under the Import-Export Clause. *Nueces Cnty. Appraisal Dist. v. Diamond Shamrock Ref. & Mktg. Co.*, 853 S.W.2d 212, 214–18 (Tex. App.—Corpus Christi–Edinburg 1993), *aff'd*, 876 S.W.2d 298.

In the Texas Supreme Court, the parties stipulated that the oil was "in transit" while in Nueces County, and Diamond Shamrock argued that it was exempt from taxation under the Import-Export Clause for that reason. *Diamond Shamrock*, 876 S.W.2d at 299–300.[15] The Court rejected that argument:

> The tax in question here does not in any way impinge on the third "harmony among the States" policy of the Import-Export Clause. Although still on its foreign import journey and in that sense "in transit," the oil in question here entered only the State of Texas and, according to the stipulated facts, never left Texas in its crude oil form. Thus, there simply was no opportunity for harmony between the states to be disturbed. Read in context, the *Michelin* Court's qualification clearly applies only to goods in transit through the state to or from another state and not to goods merely in transit within the only state the goods ever enter. *See* Robert C.W. Frantz, Comment, *Constitutional Law—Nondiscriminatory Ad Valorem Tax May Be Applied To*

---

[15] In response, the appraisal district argued that the property was not exempt because "none of the evils prevented by application of the Import-Export Clause . . . are implicated by its taxation of Diamond Shamrock's oil." *Diamond Shamrock Ref. & Mktg. Co. v. Nueces Cnty. Appraisal Dist.*, 876 S.W.2d 298, 299 (Tex. 1994).

*Imports*, 30 RUTGERS L.REV. 193, 197 (1976) (defining the "transit" discussed by the *Michelin* Court as "i.e., travelling through the importing state en route to another"). Under the Import-Export Clause, the oil is taxable in Texas.

*Id.* at 300–301 (footnotes omitted). The Court noted that

> the "in transit" nature of the oil does not bring its taxation in Nueces County into conflict with the first two policy prongs of the Import-Export Clause, as identified in *Michelin*. Although a tax on goods in transit into the foreign export stream of commerce may negatively impact the "one voice" policy, it is clear under *Michelin* that a nondiscriminatory ad valorem tax on imported goods does not violate either of the first two policy prongs of the Clause, regardless of whether the goods are in transit or not.

*Id.* at 301 n.3 (citation omitted).

### 4.     *VICO*

The Texas Supreme Court applied these principles in the export context in *VICO*.

There, the appellant "purchase[d] goods from vendors throughout the United States" on

behalf of an "Indonesian oil and gas exploration joint venture." 910 S.W.2d at 906.

> At the time of purchase, the goods are committed to foreign export and cannot thereafter be diverted to domestic use. The goods are transported from the vendors directly to an independent export packer in Houston, Harris County, Texas. Upon arriving at the export packer's facility, the goods are checked to confirm that the proper items were shipped, and that they meet specifications required for import to Indonesia. Any dispute over the items are resolved at that time. VICO then requests approval from Indonesia to import the goods. When approval is granted, an international inspection agency inspects the goods on behalf of Indonesia and clears the goods for shipment. The goods are then packed and shipped abroad on the next available vessel.
>
> In most instances, the goods remain with the export packer no longer than 45 days while these procedures are being performed. In exceptional cases, however, this period may be somewhat longer: if the goods received from the vendor are damaged or defective, or if VICO encounters problems obtaining approval for import to Indonesia, the goods may remain with the export packer for up to 175 days. VICO has some quantity of goods present at the export packer's facility year-round.

*Id.* at 907. VICO sued after its taxable property was assessed to include property located

at the export packer's facility. *Id.* In a summary judgment motion, VICO argued that "its goods are merely in transit through Texas and that they are therefore immune from state taxation under the import-export and commerce clauses." *Id.* Relatedly, VICO also argued that "neither *Michelin* nor its progeny have altered the fundamental rule that goods in the export stream of commerce are exempt from taxation." *Id.* at 910.

After reviewing the cases discussed above, the Court agreed with VICO, concluding that the "stream of export" doctrine has continued validity, despite *Michelin*. *Id.* at 908. The Court noted that, "[a]lthough the *Michelin* court rejected the original package doctrine, it did not overrule *Coe v. Errol* or any of the stream of export cases." *Id.* at 911–12 (citing *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.")). Instead, "[a]bandoning the original package doctrine 'brought *import* tax immunity into alignment with *export* tax immunity'" in that it eliminated a "loophole" which had shielded imported goods from taxation. *Id.* at 911 (quoting Frantz, *supra*, at 203). Moreover, "the rejection of the original package doctrine does not compel the conclusion that the *Michelin* court abandoned the rule of immunity for in-transit goods"; "[t]o the contrary, by explicitly articulating an exception for in-transit goods, *Michelin* appears to preserve bright-line immunity for goods in the stream of export." *Id.*

The Court then concluded that "VICO's goods were in the export stream of commerce when the tax was assessed." *Id.* at 912. It noted that "VICO's goods entered the export stream of commerce when they were shipped from the vendors to the export

21

packer's facility in Harris County because, at that point, the goods began their movement to a precommitted foreign destination." *Id.* Further, "the stoppage of VICO's goods in Harris County was attributable to an exportation, not a business, purpose." *Id.* at 913 (noting that, "[f]rom the moment of purchase, VICO retains no control to divert the goods from their precommitted foreign destination or to sell the goods in a domestic market"); *see id.* at 914–15 (noting that "[w]hile in Harris County, VICO's goods undergo only those procedures—inspection, approval for import to Indonesia, and packaging—required for exportation" and though "the delay necessary to perform these procedures is somewhat longer than that which is generally associated with a 'transportation' delay, it is no longer than is necessary to get the goods on their way to Indonesia"). Finally, the Court observed that "the tax imposed on VICO's goods transgresses the 'one voice' policy" as described in *Michelin*. *Id.* at 915 ("The tax at issue has the potential of interfering with the United States' commercial relations with Indonesia insofar as Indonesia might turn to other countries for its imported goods or might engage in retaliatory taxation of its own exports destined for the United States.").

## C. Analysis

As the above review demonstrates, the approach taken by courts to the Import-Export Clause evolved in a complex fashion, at least until 1995. In shifting the relevant inquiry from the nature of the products taxed to the nature of the tax assessed, the *Michelin* Court attempted to bring the clause's operation into closer alignment with the three principal public policies motivating its adoption. But in doing this, the United States Supreme Court necessarily eschewed the bright-line simplicity of the "original package" doctrine and made the constitutional analysis more uncertain and fact-intensive. Further,

22

*Michelin* was an import case, and it was thus unclear to what extent its principles could be extended to the export context. By subsequently concluding that "the *Michelin* approach should apply to taxation involving exports as well as imports," the *Washington Stevedoring* Court seemed to offer clarity in that regard. *See* 435 U.S. at 758. Relying on this holding, the District claims that a state exaction on goods bound for export "is valid unless it interferes with the three policy concerns" identified in *Michelin*, regardless of whether the goods are "in transit," and it proceeds to argue that the tax assessed in this case does not offend any of those three policies.

*Michelin* and *Washington Stevedoring* instruct us to disregard whether goods are characterized as exports or imports, and to focus instead on the policies underlying the clause. However, *Washington Stevedoring* did not involve a "direct" tax on goods, and, as the Texas Supreme Court observed, the cases establishing the "stream of export" doctrine, such as *Coe*, were never explicitly overruled. *See VICO*, 910 S.W.2d at 912. Instead, noting that *Michelin* excluded "in transit" goods from its purview, the *VICO* Court construed *Michelin* as "preserv[ing] bright-line immunity for goods in the stream of export." *Id.*

We are bound by the Texas Supreme Court's construction and application of United States Supreme Court caselaw, including its analysis in *VICO*, which has not been revisited or abrogated in the thirty years since its issuance. *See Dall. Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273 S.W.3d 659, 666 (Tex. 2008) ("[T]he Supreme Court of Texas possesses the power, and thus the duty, to correct a decision of a Court of Civil Appeals that conflicts with the 'supreme law of the land' as established by the Congress and Supreme Court of the United States."); *Silguero v. State*, 287 S.W.3d

23

146, 150 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.) ("As an intermediate appellate court, we are bound by supreme court precedent."). Under *VICO*, goods which are "in transit" out of the country or are "in the stream of export" enjoy "bright-line" immunity from taxation, regardless of whether the taxation advances the public policies which underlie the clause. *See* 910 S.W.2d at 912.[16]

### 1. Stream of Export

With these principles in mind, we proceed to consider whether the oil at issue here was indeed "in [export] transit" or "in the stream of export" at the time the tax was assessed. As appellees note, goods enter the stream of export when they "beg[i]n their movement to a precommitted foreign destination." *VICO*, 910 S.W.2d at 912 (first citing *Kosydar*, 417 U.S. at 70; then citing *Richfield Oil*, 329 U.S. at 82–83 (holding that delivery of oil into a storage tank of a foreign-bound steamer "marked the commencement of the movement of the oil abroad"); and then citing *A.G. Spalding & Bros. v. Edwards*, 262 U.S. 66, 68 (1923) (holding that delivery of goods to an export carrier for shipment abroad constituted a significant "step in exportation")).

Appellees contend that, according to the evidence, the subject oil had "beg[u]n [its] movement to a precommitted foreign destination" as of January 1, 2023. We agree. Horne stated in his affidavit that "[a]ll the barrels of crude oil relevant to this lawsuit" were "transported to the Corpus Christi Ship Channel by Devon exclusively for the purpose of fulfilling orders Glencore received from buyers seeking cargos of unrefined . . . oil to be delivered to foreign destinations." Bormaster similarly testified that "[a]ll the [oil] was sold

---

[16] As noted, the *VICO* Court found that "the tax imposed on VICO's goods transgresses the 'one voice' policy of the import-export clause." *Va. Indon. Co. v. Harris Cnty. Appraisal Dist.*, 910 S.W.2d 905, 914 (Tex. 1995). However, that finding was superfluous and unnecessary to the Court's analysis, as it had already concluded that "VICO's goods remain in the stream of export and immune from state taxation." *Id.*

24

to be delivered to foreign destinations." The District argues that appellees "do[] not actually know what happens to the oil after [they] transfer[] the oil to a purchaser in Corpus Christi Bay." But that is precisely what their representatives testified to in this case: Horne averred that "Glencore always exported the WTI in the Export Tanks to international markets and never diverted any of the WTI for domestic use;" Bormaster testified that "Gunvor exported all the WTI in the Export Tanks to international markets and never diverted any of the WTI for domestic use." In any event, though the District casts doubt on the affiants' ability to discern the ultimate destination of the oil, it does not dispute that their affidavits established that all of the subject oil had a "precommitted foreign destination" at the time of the appraisal. *See id.* Moreover, the District did not produce any evidence indicating that any of the oil was actually diverted for domestic use or otherwise creating a fact issue on this specific question. *See* TEX. R. CIV. P. 166a(c).

The District further contends that the oil could not have been "in transit" because it was extracted from wells in Texas[17] and was therefore not "merely flowing through" the state. It points to the observation in *Diamond Shamrock* that "the *Michelin* Court's qualification [for 'in transit' goods] clearly applies only to goods *in transit through the state to or from another state* and not to goods merely in transit within the only state the goods ever enter." 876 S.W.2d at 300–301 (emphasis added). We disagree. It is true that the oil in *Diamond Shamrock* was deemed taxable despite the parties' stipulation that it was "in transit." *See id.* However, that was an import case, and so the "stream of export" doctrine was not applied; instead, the Texas Supreme Court evaluated the effect of the tax at issue

---

[17] According to the affidavits, the oil originated from wells throughout the Permian Basin, which is mostly in Texas but extends into New Mexico. *See* R.R. COMM'N OF TEX., Permian Basin Information, https://www.rrc.texas.gov/oil-and-gas/major-oil-and-gas-formations/permian-basin (last visited Jan. 7, 2026).

on the policies identified in *Michelin*. *See id.* For the reasons set forth above, under *VICO*, such an evaluation is not necessary in this case.

The development of the caselaw strongly indicates that, though state taxation of imports and state taxation of exports are banned by the same constitutional provision, the factors considered in an analysis differ greatly depending on whether the taxed goods are destined to depart the country or have just arrived in it. To be more specific, because it was an import case, *Diamond Shamrock* does not compel the conclusion that oil "in *export* transit" may nevertheless be taxable. In any event, as appellees note, *Diamond Shamrock* was decided before *VICO*, which for the first time clarified that the "in transit" and "stream of export" analyses are essentially equivalent in export cases.

### 2. Constant Presence

The District next argues that "[r]egardless of whether [appellees'] oil was ultimately loaded onto ships for foreign export, the oil is still taxable in San Patricio County because a vast quantity of oil is constantly present in the tank farms in San Patricio County."[18] Citing a 1991 case in which it was involved, the District contends that "the oil's presence in San Patricio County is continuous" and it is not "merely passing through" the state or the county. *See Exxon Corp. v. San Patricio Cnty. Appraisal Dist.*, 822 S.W.2d 269 (Tex. App.—Corpus Christi-Edinburg 1991, writ denied).

In *Exxon*, we considered whether crude oil in transit through San Patricio County

---

[18] The District notes that it does not appraise "every drop of oil that is ever in the tanks" but rather "only appraises what is in the tanks on January 1," which "is a mere fraction of the oil that passes through the tanks and is a proxy for the oil constantly present in the tanks." But the District is only authorized to appraise property situated in the county on January 1 for more than a temporary period, TEX. TAX CODE § 21.02(a)(1); if oil is "pass[ing] through the tanks," it is there temporarily. In any event, according to testimony, the minimum volume of oil necessary for the tanks to remain operational is far less than that which was appraised to be present on January 1, 2023. And the District points to no evidence indicating that the volume of oil present in the tanks on January 1 was different than any other day of the year.

acquired situs there for tax purposes. *See id.* at 271–74. Exxo n argued that, because "each barrel of oil appraised on January 1, 1988[,] remained only temporarily in, and was merely being transported through, the county," it "could not have attained situs there" for the 1988 tax year. *Id.* at 271; *see id.* at 274 ("Property will acquire a situs when it has been located in the area with such permanence that it becomes a part of the general mass of property within the boundaries of the taxing authority."); *see also* TEX. TAX CODE § 21.02(a)(1). On the other hand, the District argued that "because Exxon maintained at least 400,000 barrels of oil in seventeen working tanks in the County at all times, the oil had been located there with such a degree of permanence that the oil became part of the general mass of property within the County." *Exxon*, 822 S.W.2d at 271.

We agreed with the District for two principal reasons. First, we noted that, in "determining whether a large quantity of oil is to be taxed," we do not "consider the situs of each individual barrel separately." *Id.* at 272. We explained:

> The fact that each individual barrel does not remain in the County for more than seventeen days, but rather flows sporadically through the working tanks, is inconsequential. We do not view this mass of oil as a continual flow of singular barrels which independently do not remain in the County long enough to establish a tax situs there. Rather, because Exxon held a quantity of over 400,000 barrels of oil in San Patricio County in seventeen tanks at all times, a massive quantity was located in the County throughout 1987 and 1988 for more than a temporary period. That the particular oil present on January 1, 1988, shortly left the county is not determinative.

*Id.* at 272–73. Second, we noted that "the controlling issue is not only the property's presence within the taxing authority's borders, but also the taxpayer's activities within the governmental unit and the opportunities and protections the government affords to those activities." *Id.* at 274 (citing *Aransas Cnty. Appraisal Rev. Bd. v. Tex. Gulf Shrimp Co.*, 707 S.W.2d 186, 191 (Tex. App.—Corpus Christi–Edinburg 1986, writ ref'd n.r.e.) ("Whether property has a tax situs in a particular state is purely a due process

27

question. . . . The test under the Due Process Clause is whether the tax in practical operation has relation to opportunities, benefits, or protections conferred or afforded by the taxing State." (internal quotation omitted))). Because "San Patricio County provided protection to the oil and bore a substantial risk of significant financial injury in the event of a mishap, such as a massive leak or fire," the tax was proper. *Id*.

*Exxon* did not involve imports or exports, and it did not discuss whether the oil was "in transit" or in the "stream of export." Moreover, though some courts have considered taxpayer activities and government protections in determining whether property is taxable, that is not among the policy considerations referred to in *Michelin* or any other Import-Export Clause case. Therefore, *Exxon* has limited relevance here.[19] Nevertheless, it is instructive to the extent it explores the difference between the tax treatment of fungible property, such as fluid or a grain commodity, and discrete, countable items such as ordinary consumer products. We concluded that "[i]t would be inappropriate when analyzing a quantity of fungible personal property for purposes of discerning its proper tax situs to find that the quantity should be broken down into individual units." *Id.* at 273. This approach would also be inappropriate for purposes of discerning whether such property was in the stream of export. As both parties concede, due to the physical nature of oil as a fungible fluid, it is impossible to describe which specific portions remained in the tanks and which were exported. Here, it is undisputed that several tens of thousands of barrels had to remain in the subject tanks at all times in order for them to function properly, but under *Exxon*, we do not consider those "tank heels," which export customers

---

[19] The District cites no authority, and we find none, indicating that property may be taxed, despite its presence in the "stream of export," so long as the quantity is sufficiently "vast."

28

are responsible for maintaining, separately from the remainder of the oil in the tanks. All of it had a "precommitted foreign destination" and all of it entered the "stream of export."

### 3. Purpose of Temporary Stoppage

Having concluded the oil entered the stream of export, we finally consider whether the "continuity of transit" was broken by its storage in tanks in San Patricio County.[20]

The effect of a "temporary stoppage" of goods in the stream of export depends on the purpose of the stoppage. *VICO*, 910 S.W.2d at 912. "If the stoppage is attributable to the business purpose of the owner, then the exportation is deemed to have terminated, and the goods are subject to tax in the jurisdiction of their stoppage." *Id.* (citing *Blasius*, 290 U.S. at 11–12). "For instance, if goods are delayed for the purpose of further processing or for storage pending the receipt of orders, the goods are no longer in the stream of commerce." *Id.* (first citing *Bacon v. Illinois*, 227 U.S. 504 (1913) (holding that stoppage of grain for processing served owner's business purpose); and then citing *Blasius*, 290 U.S. at 12 (holding that storage of inventory awaiting orders served owner's business purpose)). But if a stoppage is "due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement," the "continuity of transit is not interrupted, and the goods remain immune from taxation throughout the stoppage." *Id.* (quoting *Blasius*, 290 U.S. at 9–10). "Delays that are incidental to the journey and to a necessary change in the mode of transportation do not affect the continuity of transit." *Id.*

In *VICO*, when the goods were stopped in Harris County, they underwent "only

---

[20] The District does not discuss this matter in its briefs. We address it out of an abundance of caution and in our sole discretion.

29

those procedures—inspection, approval for import to Indonesia, and packaging—required for exportation," and the delay was "no longer than is necessary to get the goods on their way" to their foreign destination; therefore, the stoppage was "attributable to an exportation, not a business, purpose." *Id.* at 913. Here, both Horne and Bormaster testified that the oil is stored in the tank farms until such time as there is "sufficient volume of product" to "completely load the vessel without having to await arrival of the final barrels" of oil. Crucially, both stated that the export terminals decide when to call the vessel into berth and that appellees could not use the export terminals without first storing the accumulated oil at the tank farms. We conclude that this testimony established the stoppage in San Patricio County was "attributable to an exportation, not a business, purpose." *See id.* The District points to no controverting evidence raising a fact issue. Accordingly, the continuity of transit was not interrupted, and the oil is exempt from taxation.

For the reasons set forth above, the trial court did not err in granting summary judgment in favor of appellees. *See* TEX. R. CIV. P. 166a(c). The District's second issues are overruled.

## IV.　CONCLUSION

Having concluded that the subject oil was in the stream of export and therefore enjoyed "bright-line" immunity from taxation under the Import-Export Clause of the United States Constitution, we affirm the trial courts' judgments.

YSMAEL D. FONSECA
Justice

Delivered and filed on the
8th day of January, 2026.

30